240 P.3d 79 (2010)
237 Or. App. 531
Eric HOFFMAN and Ronna Hoffman, Petitioners,
v.
DESCHUTES COUNTY, Respondent, and
Mark Latham Excavation, Inc., Respondent.
Mark Latham Excavation, Inc., Respondent,
v.
Deschutes County, Respondent, and
Eric Hoffman and Ronna Hoffman, Petitioners.
2009061, 2009062; A145693.
Court of Appeals of Oregon.
Argued and Submitted July 22, 2010.
Decided September 29, 2010.
Paul D. Dewey, Bend, argued the cause and filed the brief for petitioners.
Laurie E. Craghead argued the cause and filed the brief for respondent Deschutes County.
Bruce W. White, Bend, argued the cause and filed the brief for respondent Mark Latham Excavation, Inc.
Before SCHUMAN, Presiding Judge, and WOLLHEIM, Judge, and ROSENBLUM, Judge.
ROSENBLUM, J.
Petitioners seek review of a Land Use Board of Appeals (LUBA) decision that affirmed Deschutes County's interpretation of *80 its own code provisions regarding mining near "dust-sensitive uses" and "noise-sensitive uses." Those provisions, petitioners contend, protect petitioners' entire parcel rather than simply a residence on their property. The county, however, interpreted the "dust-sensitive use" and "noise-sensitive use" provisions as applying only to the part of petitioners' property that actually housed the dust-sensitive or noise-sensitive use  i.e., the dwelling. On review, petitioners argue that the county interpreted its code too narrowly, and that LUBA erred in affirming that erroneous interpretation. We affirm.
The facts, as recited in LUBA's decision, are not disputed by the parties; we have supplemented our recitation of those facts with our understanding of the procedural history of the case. Respondent Mark Latham Excavation, Inc. (Latham) requested approval of a site plan and conditional use permit to operate a surface mine on an 80-acre parcel in Deschutes County. The property is located in a Surface Mining Zone, subject to Chapter 18.52 of the Deschutes County Code (DCC).
By way of background, Chapter 18.52 is part of the county's implementation of Goal 5, the statewide planning goal concerning protection of natural resources and conservation of scenic, historic, and open space resources. OAR chapter 660, division 16. In 1990, the county adopted four ordinances to comply with its Goal 5 planning obligation. The first ordinance adopted new comprehensive plan goals and policies for surface mining. The second ordinance adopted an inventory of significant mineral and aggregate sites, including Latham's site (listed as site 303).[1] The third ordinance adopted what are known as "ESEE Findings and Decisions," which analyzed the economic, social, environmental, and energy consequences for individual sites, including site 303. The fourth ordinance amended the Surface Mining Zoning provisions in Chapter 18.52, the chapter of the county's code that is at issue here.
Petitioners, who own adjoining property to the north of Latham's site, opposed his development application on a number of grounds, including that the mining operation would violate various provisions in Chapter 18.52 concerning "dust-sensitive uses" and "noise-sensitive uses." Those provisions included, for example, setback requirements, DCC 18.52.090(A) (subject to certain exceptions, "all surface mining activities and uses, including structures, shall be located and conducted at least 250 feet from a noise-sensitive or dust-sensitive use or structure"), and screening requirements, DCC 18.52.110(B) (requiring screening to obscure the view of the mining operation from certain "[n]oise-sensitive or dust-sensitive uses").
A hearings officer for the county determined that two of Latham's three proposed processing sites would not meet the minimum setback required by DCC 18.52.090; "[t]he crusher and materials washer shall only be located in the southwestern processing site[.]" She further concluded that certain mining activities would be visible from petitioners' property, in violation of DCC 18.52.110, and therefore conditioned approval of the application on Latham installing a berm and plantings within the setback that would screen the site from petitioners' property. Latham then sought reconsideration of those conditions,[2] arguing that the minimum distances for setback and screening criteria *81 should be determined based on the location of petitioners' actual residence, and not from the driveway or other grounds that surround the residence.[3] Latham relied on the definitions of "dust-sensitive use" and "noise-sensitive use" provided in the county code:
"`Dust-sensitive use' means real property normally used as a residence, school, church, hospital or similar use. Property used in industrial or agricultural activities is not `dust-sensitive' unless it meets the above criteria in more than an incidental manner. Accessory uses such as garages and workshops do not constitute dust-sensitive uses.
"* * * * *
"`Noise-sensitive use' means real property normally used for sleeping or normally used as schools, churches, hospitals or public libraries. Property used in industrial or agricultural activities is not `noise-sensitive' unless it meets the above criteria in more than an incidental manner. Accessory uses such as garages or workshops do not constitute noise-sensitive uses."
DCC 18.04.030.
On reconsideration, the hearings officer rejected Latham's interpretation of those definitions. She reasoned:
"The use of the phrase `real property' connotes the grounds around the dwelling, and not just the dwelling itself. * * * This understanding is consistent with the concept of `noise-sensitive uses.' People traveling to and from those structures are likely to be more affected by noise than people who are entering or using structures for non-residential, church, library, school or hospital purposes. Further, the definition recognizes that some structures, namely garages, workshops and the like are not noise-sensitive areas. Again, if the board of county commissioners had intended to limit the area included in as a `noise sensitive use' to only the dwelling or other sleeping quarters, it could have done so. Similarly, the definition of `dust-sensitive uses' applies to `real property used as a residence * * *.'
"The evidence shows that [petitioners'] property is used as a residence. People driving along [petitioners'] driveway can see and hear mining activities that occur right across the property line. Further, while [Latham] provided testimony and evidence that applicable standards could be met if measured from [petitioners'] dwelling, there is no evidence that the standard can be met if measured from the driveway patronized by residents of the dwelling or their guests. Therefore, mining activities that affect the residential use of [petitioners'] property must be considered, and conditions imposed to ensure that the applicable standards are satisfied."
(Footnote omitted.)
Both Latham and petitioners appealed the hearings officer's decision to the board of county commissioners, challenging various aspects of the decision. One of the issues before the board was the hearings officer's conclusion that "noise-sensitive and dust-sensitive uses comprised, not just the immediate area surrounding the dwellings or structures that define the use, but other areas of the property, including fields and driveways far removed from the structures that define the use."[4]
The board, after considering the definitions in DCC 18.04.030, rejected the hearings officer's interpretation of "dust-sensitive use" and "noise-sensitive use." The board explained that, based on their text and context, the definitions were intended to apply only "to the area around the structure and not the entire property." Accordingly, the board overturned the hearings officer's order to the extent that it measured distances for setbacks and screening from places on petitioners' property other than the dwelling itself.
*82 Petitioners sought LUBA's review of the board's order, and Latham cross-petitioned for review. The parties disagreed about a number of aspects of the board's order, but as relevant here, petitioners took issue with the county's interpretation of "dust-sensitive use" and "noise-sensitive use," arguing that the county had applied the definitions in DCC 18.04.030 too narrowly. LUBA framed the issue in this way:
"The reference in the [definitions for `dust-sensitive use' and `noise-sensitive use'] to `real property' and to particular kinds of uses that are normally housed in structures arguably permits at least two significantly different interpretations.
"Under the first interpretation, a dust-sensitive use would include all of the real property (the entire lot or parcel) that is developed with a `residence, school, church, hospital or similar use.' Similarly, under the first interpretation, a noise-sensitive use would include the entire lot or parcel that is developed with a dwelling or other building where people sleep or with `schools, churches, hospitals or public libraries. * * *'
"Under the second interpretation, since both interpretations refer almost exclusively to uses that are carried out for the most part in structures, and structures provide refuge from noise and dust, the emphasis would be on the structures that house those uses. Under this interpretation, only the structures used for residences, schools, churches, hospitals or similar uses would qualify as dust-sensitive uses. Similarly, only the structures used for sleeping or the structures `normally used as schools, churches, hospitals or public libraries' would qualify as noise-sensitive uses. As we explain below, the county adopted a variation on the second interpretation."
After examining the text of DCC 18.04.030, LUBA explained that "the definition is ambiguous in that there is language in the definition that would permit it to make the entire lot or parcel noise-sensitive or only the structure noise-sensitive." Moreover, LUBA reasoned, "the context cited by the county adds some additional support to its interpretation that the structure is the noise-sensitive use." That context included "other sections of the DCC [that] commonly measure setbacks from structures"; "measuring setbacks from undefined activities or accessory uses of property that might be associated with the structure would be difficult and uncertain"; and "the exclusion of garages and workshops suggests only structures were intended to qualify as noise-sensitive uses." For those reasons, LUBA, citing this court's decision in Siporen v. City of Medford, 231 Or.App. 585, 220 P.3d 427 (2009), rev. allowed, 348 Or. 13, 227 P.3d 1172 (2010), deferred to the county's interpretationan interpretation that LUBA considered "plausible," indeed "at least as plausible as petitioners' interpretation."
Petitioners now seek review of LUBA's decision. In a single assignment of error, petitioners submit that "LUBA erred in its application of the Siporen `plausibility' standard of review for a local jurisdiction's interpretation of its own provisions and violated the requirements of ORS 197.829 and the Oregon Supreme Court [decision in Clark v. Jackson County, 313 Or. 508, 836 P.2d 710 (1992)]."[5] According to petitioners, the county erroneously interpreted "noise-sensitive use" and "dust-sensitive use" as referring only to the use within a structure, as opposed to the surrounding grounds. In petitioners' *83 view, that interpretation ignored the "express language" of the code provisions, and LUBA erred in affirming it.
As we explained in Siporen, when reviewing a local government's interpretation of its own code, "our task is to determine whether, based on the express language of the code, the [local government's] interpretation concerning the applicability [of the code] is `plausible'"; we do not determine whether the local government's decision is "`correct' in some absolute sense of choosing among various plausible interpretations," but only whether the interpretation is plausible based on its text and context. 231 Or.App. at 598-99, 220 P.3d 427 (emphasis in original); see also Western Land & Cattle, Inc. v. Umatilla County, 230 Or.App. 202, 209-10, 214 P.3d 68 (2009) (explaining that "the `consistency with the express language' inquiry looks at the text of the plan provision or the regulation in question, as well as the context of other parts of the plan or regulation that are relevant to the textual meaning of that `express language'").
The "express language" at issue in this case is set forth in DCC 18.04.030, in the definitions of "dust-sensitive use" and "noise-sensitive use." Those definitions, once again, provide:
"`Dust-sensitive use' means real property normally used as a residence, school, church, hospital or similar use. Property used in industrial or agricultural activities is not "dust-sensitive" unless it meets the above criteria in more than an incidental manner. Accessory uses such as garages and workshops do not constitute dust-sensitive uses.
"* * * * *
"`Noise-sensitive use' means real property normally used for sleeping or normally used as schools, churches, hospitals or public libraries. Property used in industrial or agricultural activities is not "noise-sensitive" unless it meets the above criteria in more than an incidental manner. Accessory uses such as garages or workshops do not constitute noise-sensitive uses."
DCC 18.04.030 (emphasis added). Both definitions refer to the way in which "real property" is "normally used." The term "real property" means "land, buildings, structures, improvements and fixtures, mines, minerals, quarries, vegetation, timber and water rights." DCC 1.04.010 (emphasis added). "Use," meanwhile, is defined in the code as "the purpose for which land or a structure is designed, arranged or intended, or for which it is occupied or maintained." DCC 18.04.030 (emphasis added).
There is no question that, as a general matter, the term "use" is not limited solely to "structures" under the Deschutes County Code.[6] As set out above, a "use" under the code typically refers to the purpose for which land or a structure on that land is designed, arranged, or intended, or for which it is occupied or maintained. Moreover, "real property" could plausibly be interpreted as referring to the entire parcel on which a "noise-sensitive use" or "dust-sensitive use" is found, and not simply the structure in which it is housed. In short, petitioners' proposed interpretationthat a noise-sensitive use or a dust-sensitive use extends to real property beyond the structure itselfis indeed a reasonable construction of the code. But our inquiry is not whether petitioners' interpretation is reasonableor even the better one; our inquiry is whether the county's interpretation, based on the express language of the text, is plausible. Siporen, 231 Or.App. at 599, 220 P.3d 427.
Other text within the definitions of "dust-sensitive use" and "noise-sensitive use" persuades us that a noise-sensitive or dust-sensitive use plausibly refers, as the county concluded, to the use within a structure. To begin with, only real property "normally used as a residence, school, church, hospital or similar use" qualifies as a "dust-sensitive use." Likewise, only real property "normally used for sleeping or normally used as schools, churches, hospitals or public libraries" qualifies as a "noise-sensitive use." All of the specifically identified "uses" of real propertywith the exception of "sleeping" *84 are also structures: residences, schools, hospitals, churches, public libraries. And even the lone exception, sleeping, typically occurs within a structure. Thus, the text of the definitions is consistent with the county's understanding that dust-sensitive and noise-sensitive uses are limited to the part of the real propertyi.e., the structurewhere the dust- and noise-sensitive activities occur, and do not encompass the surrounding parts of the real property.
Moreover, other parts of Chapter 18.52 lend support to the county's interpretation. DCC 18.52.090, for example, concerns "minimum use setbacks" in the Surface Mining zone and requires that "all surface mining activities and uses, including structures, shall be located and conducted at least 250 feet from a noise-sensitive or dust-sensitive use or structure." It then allows for a written agreement "for a lesser setback made between the owner of the noise-sensitive or dust-sensitive use or structure located within 250 feet of the proposed surface mining activity and the owner or operator of the proposed surface mine." As the county correctly points out, "setbacks" are measured throughout the Deschutes County Code in terms of distance from a building. The code defines a setback as "an open space on a lot which is unobstructed from the ground upward except as otherwise provided in DCC Title 18." It then provides the following related definitions:
"`Setback, front' means a setback between side lot lines, measured horizontally at right angles to the front lot line from the front lot line to the nearest point of a building.
"`Setback, rear' means a setback between side lot lines, measured horizontally at right angles to the rear lot line from the rear lot line to the nearest point of a building.
"`Setback, side' means a setback between the front and rear yard measured horizontally at right angles from the side lot line to the nearest point of a building.
"`Setback, street side' means a setback adjacent to a street between the front setback and rear lot line measured horizontally and at right angles from the side lot line to the nearest point of a building."
DCC 18.04.030. The fact that "setback" requirements in the county's code are measured from "buildings" is, at the very least, consistent with the county's view that the "noise-sensitive uses" and "dust-sensitive uses" from which setbacks are measured in Chapter 18.52 are likewise buildings.
Petitioners contend that such a construction renders other parts of Chapter 18.52 superfluousnamely, those provisions that refer to a "noise-sensitive or dust-sensitive use or structure." DCC 18.52.090 ("Except as otherwise provided in DCC 18.52.090, all surface mining activities and uses, including structures, shall be located and conducted at least 250 feet from a noise-sensitive or dust-sensitive use or structure."); see also DCC 18.52.110(I), (J) (referring to "noise-sensitive or dust-sensitive use or structure"); DCC 18.52.140(A) ("noise-sensitive use or structure"); DCC 18.52.140(C)(1), (2) ("noise or dust-sensitive use or structure"). An interpretation that gives effect to every word in the county's code is obviously preferable, but that is not possible here; even petitioners' proposed construction yields redundancy. As explained above, a "noise-sensitive use" necessarily includes a "noise-sensitive structure" within the meaning of the code, and a "dust-sensitive use" likewise includes a "dust-sensitive structure." In the context of the code as a whole, the employment of the phrase "dust-sensitive use or structure" or "noise-sensitive use or structure"rather than the defined terms "dust-sensitive use" and "noise-sensitive use"is as likely the product of inexact drafting as it is a textual clue as to the meaning of the terms "dust-sensitive use" or "noise-sensitive use." Cf. Friends of Yamhill County v. Yamhill County, 229 Or.App. 188, 194-95, 211 P.3d 297 (2009) (noting that redundancy is a fairly common feature of legislative drafting). For that reason, we are not persuaded by petitioners' contextual analysis.
In addition to arguing that the code definitions of "dust-sensitive use" and "noise-sensitive use" were misconstrued by the county, petitioners appear to argue, alternatively, that the county looked to the wrong source *85 for the definition of those terms. More specifically, petitioners argue that the county should have looked to the "definitions" of those terms in a site-specific ESEE Findings and Decision rather than the definitions in DCC Chapter 18.52. As previously noted, the county adopted in 1990 an "ESEE Findings and Decision" for site 303, the site which Latham intends to mine. The ESEE Findings and Decision discusses various "conflicts with the uses at the site and in the surrounding zones," including:
"(1) The impacts of noise (including heavy equipment, truck traffic, blasting, processing, and drilling) on persons dwelling in or patronizing noise-sensitive uses in the surrounding zoning. The Board finds that under DEQ noise standards, all possible uses in the surrounding zones would be noise-sensitive uses, except utility uses, landfill uses, other mining or geothermal uses, personal landing strip uses, forest products processing uses, and hydroelectric uses.
"(2) The impacts of dust on dust-sensitive uses. The Board finds that all commercial, residential, park, or community-type uses are dust-sensitive uses due to the potential health impacts of dust on occupants and patrons."
Petitioners argue that, to the extent that those "definitions" conflict with the county's interpretation of "dust-sensitive use" and "noise-sensitive use" in the county code, the ESEE controls. For that proposition, petitioners rely on DCC 18.52.020, which provides that, "[w]hen there is a conflict between the site-specific ESEE analysis and the provisions of DCC 18, the site-specific ESEE analysis shall control."
The county rejected that same argument, on the ground that petitioners had misinterpreted DCC 18.52.020specifically, the term "ESEE analysis." The "ESEE analysis," the county explained, referred to a particular part of the ESEE Findings and Decision, the "Program to Meet the Goal" section, which actually describes the standards for implementing the program to meet Goal 5 with respect to site 303. The "definitions" of noise-sensitive and dust-sensitive uses relied on by petitioners are found in the "Findings and Conclusions" section of the ESEE Findings and Decision, which, the county determined, is not part of the "ESEE analysis" and therefore cannot somehow trump the provisions of Chapter 18.52.
Given our deference to the county's interpretation of its own code, we are not persuaded that LUBA or the county erred regarding treatment of the ESEE Findings and Decision. The term "ESEE analysis" is not defined in the county's code, the ESEE Findings and Decision, or, as far as we can tell, anywhere else. The county's interpretation of that phrase in DCC 18.52.020 is certainly a plausible one, considering that the "Program to Meet the Goal" section of the ESEE Findings and Decision embodies the county's zoning determination ("the site on the top of the plateau will be zoned for surface mining") and imposes particular "ESEE conditions" in order to ensure that Goal 5 will be met. It is logical to conclude, as the county did, that the zoning and conditions established in the "Program to Meet the Goal" are the types of "analysis" that would potentially conflict with the zoning provisions of DCC Chapter 18.52. We therefore reject petitioners' contention that the "definitions" in the ESEE Findings and Decision required a different decision by the county.
Lastly, and alternatively, petitioners contend that, to the extent that we conclude that the county's interpretations of "noise-sensitive use" and "dust-sensitive use" are "plausible"which we described in Siporen as the standard for affirming a local government's interpretation of its own codethen Siporen's "plausibility standard" is contrary to ORS 197.829 and Clark, 313 Or. 508, 836 P.2d 710. We reject that argument without discussion.
Affirmed.
NOTES
[1] Pursuant to Goal 5, local governments are to inventory key resources including mineral and aggregate sites. See OAR XXX-XXX-XXXX (inventory of Goal 5 resources).
[2] Condition 9 stated:

"The owner/operator shall control noise generated by the mining operation and its associated activities so as to meet all applicable DEQ standards. Natural terrain and vegetative features shall be retained to buffer the mining activity from the surrounding area. All crushing operations shall be conducted below grade (ground level). The crusher and materials washer shall only be located in the southwestern processing site identified on the revised site plan."
Condition 12 stated:
"The applicant shall maintain the 100-foot buffer area along the north property line. No mining activities, except supplied landscaping and reclamation, shall be conducted within this buffer area. To minimize the visual and noise impacts to residential uses on [petitioners'] property, the applicant shall install a berm and/or supplied landscaping along the north property line near the water tower and parking areas and extended to the western edge of the previously mined area."
[3] There are two residences on petitioners' property. Only one of the residences, which was constructed prior to the 1990 changes to Chapter 18.52, is relevant to the issues on review.
[4] Latham challenged the imposition of the conditions, and petitioners appealed "the Hearings Officer's failure to uniformly apply the definition of noise-sensitive use to require noise measurements to be taken `anywhere on the property where [petitioners' residence] is located.'"
[5] Latham, in response, points out that the assignment of error does not comply with ORAP 5.45(3), which requires petitioners to identify "precisely the legal, procedural, factual, or other ruling that is being challenged." "Petitioners' lack of precision," Latham argues,

"makes it difficult * * * to determine exactly which portion or portions of LUBA's decision are being challenged and what the reach of Petitioners' assignment is. [Latham] is left to look at what pages of the LUBA decision Petitioners have cited to in their citations to the record to divine what portion or portions of LUBA's case is or are at issue."
Thus, Latham asks that we disregard the assignment of error and dismiss the case. Although we share Latham's frustration with the imprecision of the assignment, the issues that we address the interpretation of the definitions of "dust-sensitive use" and "noise-sensitive use"were adequately framed for our review, and we therefore decline Latham's invitation to dismiss the case.
[6] A "structure" is defined in the code as "something constructed or built having a fixed base on, or fixed connection to, the ground or another structure." DCC 18.04.030.