Argued and submitted June 11, affirmed October 21, 2015

Greg WIECK
and Claudette Wieck,
*Plaintiffs-Appellants,*

*v.*

D. Rahn HOSTETTER;
D. Rahn Hostetter, P.C.;
and Hostetter Knapp, LLP,
*Defendants-Respondents.*

Wallowa County Circuit Court
111213990; A155659

362 P3d 254

Bonnie Richardson argued the cause for appellants. With her on the briefs were Corey Tolliver and Folawn Alterman & Richardson LLP.

Andrew J. Myers argued the cause for respondents. With him on the brief was Thomas C. Peachey, P.C.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

LAGESEN, J.

**LAGESEN, J.**

This is an action for professional negligence. Plaintiffs allege that defendant, their former lawyer,[1] committed malpractice through a course of dealing with plaintiffs that eventually forced them to sell off a valuable stone quarry, resulting in $2 million in damages. The trial court granted defendant's motion for summary judgment, ruling that plaintiffs' malpractice claim was barred by the statute of limitations and, alternatively, that it was barred by a settlement agreement between the parties that had included a mutual general release of all claims. On appeal, we agree with the trial court's conclusion that plaintiffs and defendant entered into a valid and enforceable settlement agreement that bars plaintiffs' action, and we affirm on that basis.

## I. BACKGROUND

A. *Substantive Facts*

Because this appeal arises from the trial court's grant of summary judgment, we state the substantive facts in the light most favorable to plaintiffs, the nonmoving party. *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997). Plaintiffs are a married couple who owned a ranch and farm in Wallowa County, Oregon. They met and became friends with defendant, an attorney and rancher in the area. In addition to their friendship, the parties had business dealings: Defendant advised plaintiffs as their lawyer, and also rented plaintiffs' 1600-acre ranch to pasture his cows.

In 2003, plaintiffs entered into an agreement with defendant to sell their farm and ranch to him on a 12-year installment contract, with payments due each April. Plaintiffs withheld from the sale a 40-acre parcel that contained a stone quarry; the quarry was their only planned source of retirement income. They told defendant that, although the quarry was not part of the sale, they would give him an option to purchase the quarry in the event that they eventually decided to sell it. Defendant drew up the parties' installment contract for the sale.

---

[1] Defendant's law firm is also a defendant in this action. For readability, we generally do not distinguish between defendant and his law firm, unless otherwise noted.

In August 2005, defendant told plaintiffs that he needed to borrow money to make the annual payment that had been overdue since April. Plaintiffs executed a statutory warranty deed for parcels that were conveyed in earlier installments, and defendant took out a loan from NW Farm Credit Services for $388,852. Defendant then made a payment of $125,000 for the 2005 installment, and plaintiffs gave defendant a statutory warranty deed for the land covered by that payment.

In 2008, defendant told plaintiffs that he again needed to borrow money from NW Farm Credit Services to pay plaintiffs, as well as to pay his own bills. Defendant asked plaintiffs to meet defendant and his wife at defendant's law office, so that they could walk over to the Wallowa County Title Company. Plaintiffs did as requested and, at the title company, were instructed to sign certain documents, but were not given time to read those documents. Plaintiffs believed that the documents were similar to the deeds and other documents that they had signed in 2005.

The documents were not similar to the ones that plaintiffs signed in 2005. Instead, the 2008 documents differed from earlier deeds in important respects: The 2008 documents included a deed of trust, whereby plaintiffs granted NW Farm Credit Services a security interest in their own property to cover defendant's outstanding indebtedness (which had increased to $447,500). Moreover, that deed of trust covered ranch land that defendant had not yet purchased under the installment land sale contract, as well as the stone quarry.

Defendant later informed plaintiffs that he was on the verge of bankruptcy and would not be able to make further payments on the land sale contract. Plaintiffs, now uneasy about their relationship with defendant, sought advice from a family friend, Roach, who had been a judge in Washington State. Roach was not familiar with Oregon law and did not have a copy of the 2008 deed of trust when he spoke with plaintiffs, but Roach was concerned that plaintiffs had not fully understood the documents they had signed. Roach suggested that plaintiffs consult an Oregon attorney, Sam Tucker.

Plaintiffs called Tucker on December 14, 2009, and then met with him later that month. During the meeting or soon after, Tucker instructed plaintiffs to obtain a copy of the deed of trust from the county recorder.

After plaintiffs obtained the deed of trust, Tucker reviewed the documents. He also consulted with Michael Greene, a Portland attorney specializing in legal malpractice. Tucker then had several telephone conversations with plaintiffs in early January 2010, discussing his findings. And, on January 12, 2010, Tucker sent plaintiffs a letter summarizing his discussions with plaintiffs, the steps that he had taken to evaluate plaintiffs' potential claims against defendant, including meeting with Greene regarding legal malpractice issues, and his initial assessment of those potential claims. In the letter, Tucker noted that, "[a]fter we talked, you were still very concerned and wanted to meet with the attorney in Portland on this matter. You are going to meet with Greene this week." Through those discussions with Tucker in early January 2010, plaintiffs recognized that the documents they signed in 2008 at defendant's request had subordinated their property interest, including their interest in the quarry, to the $447,500 lien owed to NW Farm Credit Services.

About a month later, on February 20, 2010, defendant contacted Tucker and informed him that defendant had found a purchaser for the property—but that the purchaser was insisting that the quarry be part of the deal. Defendant claimed that, if plaintiffs did not agree to the sale, he would stop making payments, go bankrupt, and, perhaps, sue plaintiffs for damages. Tucker relayed that information to plaintiffs.

Tucker, acting on behalf of plaintiffs, began negotiating with defendant regarding the potential sale. After about two weeks, on March 4, 2010, the parties reached an agreement that would allow defendant to sell the property and pay off plaintiffs. Tucker set out the terms of the agreement in an email to defendant, which provided:

"This email confirms our settlement. [Plaintiffs] and you have agreed as follows:

"You will deliver to [plaintiffs] a check payable to them and to me in the amount of $15,000.

"[Plaintiffs] will pick up the check from your office and will go to Wallowa Title Company and sign the deed.

"[Plaintiffs] will deliver the check to me.

"The parties agree to a mutual general release. The present plan is to have you prepare a general mutual release, sign it and deliver it to me.

"I am authorized to release the check to [plaintiffs] upon their signing the mutual release and my return of it to you.

"This settlement is conditioned on the closing of the sale with [the third-party purchaser, Rock'n J Properties].

"Please confirm your agreement. Once I have your confirmation, I will email new instructions to the escrow company and instruct [plaintiffs] to pick up the check and go to the title company."

Defendant responded, "I accept. We must get it done today. This is holding up closing as we 'speak.'" Although the agreement provided for a mutual general release, the parties' agreement did not address how that mutual general release would be phrased.

Pursuant to the parties' agreement, the sale to Rock'n J Properties closed and plaintiffs were paid the remaining balance on the land sale contract out of the proceeds from the sale. Defendant subsequently tendered the $15,000 check contemplated by the settlement. On March 8, 2010, Tucker sent an email to defendant that stated:

"Thought I would let you know that I received in today's mail your check payable to [plaintiffs] and me. You will be preparing the mutual release. If there are any problems, let me know.

"This was not an easy matter for you or [plaintiffs]. I am glad it is over."

Tucker later contacted plaintiffs and told them that he had in his possession the release drafted by defendant. Plaintiffs, however, did not see the draft release until April 2010. When they read it, they refused to sign it because they thought "that it contradicted the representations made to us on March 4, 2010."

On April 16, 2010, Tucker notified defendant by email about plaintiffs' concerns with the draft release:

"[Plaintiffs were in my office to sign the release. They asked if it should reference the $15,000. That was part of the settlement. They would be more comfortable if the release recited this part of the settlement.

"Could you add to second paragraph: 'Upon receipt by [plaintiffs] of the sum of $15,000, the sufficiency of which is hereby acknowledged * * *.

"* * * * *

"Thank you for your patience. We are now in a position to finalize this matter."

Ten days later, on April 26, 2010, Tucker sent a follow-up email to defendant, which reiterated the same concern regarding reference to the $15,000 payment:

"I thought I sent you an email a couple weeks ago indicating that [plaintiffs] were ready to sign the release but wanted language added indicating that the release was for payment of $15,000. I suggested adding to the second paragraph 'For the consideration of $15,000 to be paid by [defendant and his wife] to [plaintiffs] and for other valuable consideration,' the parties hereby * * *.

"I went back to my emails and can not seem to find the email. I either misfiled it or did not hit the 'send' button.

"Contact me if there is any problem. Otherwise, please make this change, both you and [your wife] sign duplicates and return them to me asap. I will then get [plaintiffs] to sign, return one original to you and release the check I hold."

(Underscoring omitted.) Plaintiffs terminated their relationship with Tucker before signing the release and, ultimately, never signed any release. They returned the $15,000 check to defendant.

## B.  *Procedural History*

In December 2011, plaintiffs filed this action against defendant and his law firm, alleging a claim for professional negligence. In their first amended complaint, the operative pleading in the case, plaintiffs alleged that defendant

breached his duty of care as plaintiffs' lawyer by, among other things, failing to afford plaintiffs an opportunity to review the note and 2008 trust deed, failing to tell plaintiffs that that trust deed would subordinate their interest to the lien held by NW Farm Credit Services, and arranging a sale that forced plaintiffs to give up their interest in the quarry. Plaintiffs sought $2 million in damages as a result of the forced sale of the quarry.

Defendant denied the bulk of plaintiffs' allegations and, in his original answer, asserted various defenses, including "release" and "compromise and settlement."[2] Defendant subsequently sought leave to amend his answer to add a counterclaim for specific performance based on the parties' purported settlement agreement. At a hearing on the motion to amend, defendant explained that "there is actually a defense that's really very similar to the counterclaim, but we wanted it to be a counterclaim" for purposes of a motion for summary judgment. The trial court allowed the amendment.

Meanwhile, defendant had moved for summary judgment on plaintiffs' claim, asserting two alternative bases for the motion. First, defendant argued that plaintiffs' claim was commenced beyond the two-year statute of limitations for negligence, ORS 12.110(1), because plaintiffs knew or should have known of defendant's alleged malpractice by the time that they consulted Roach, the former judge, about defendant's actions—a meeting that took place sometime before plaintiffs placed a call to Tucker on December 14, 2009. Second, defendant argued that plaintiffs and defendant entered into a release agreement on March 4, 2010, which "releases any and all claims arising from the contract for the purchase and sale of land described in plaintiffs' complaint." With regard to the latter basis for summary judgment, defendant requested "specific performance of the parties' agreement through an order dismissing this action and prohibiting plaintiffs from bringing any other claims barred by the terms of their negotiations."

---

[2] Defendant's ninth affirmative defense stated that "an agreement compromising and settling any and all claims assertable by plaintiffs against defendants was entered into on February 24, 2010, and that any claims plaintiffs may have or have had are therefore barred by the terms of such agreement."

In response to defendant's motion, plaintiffs argued that genuine issues of material fact precluded summary judgment on either statute of limitations or settlement grounds. With respect to timeliness of the action, plaintiffs argued that it "was not until after Mr. Tucker reviewed the documents and consulted with Michael Greene, expert attorney out of Portland specializing in legal malpractice, that they first became aware, January 8-12, 2010, of that damage caused by [defendant]." As for the question of settlement, plaintiffs insisted that the parties had never formed an enforceable release agreement. Plaintiffs summarized their argument as follows:

"• The *offer* made was not certain in nature or extent of the obligations of each party.

"• There was never a *meeting of the minds* as to the objective manifestations of the intent of both parties to form the release.

"• *Consideration* in the form of financial incentive was not accepted.

"• The March 4th 2010 Mutual Release Agreement was never fully accepted by the Plaintiff."

(Emphasis by plaintiffs.)

After a hearing on defendant's motion, the trial court ruled in defendant's favor in a letter opinion. The letter opinion stated:

"1. The Court finds in favor of the Defendants and grants the Summary Judgment Concerning the issue of statute of limitation.

"2. The Court will also find that Plaintiffs and Defendants entered into a negotiated agreement that is both valid and enforceable.

"[Defendants' counsel] may prepare a proper judgment in these matters."

Approximately one month later, the trial court then signed an order prepared by defendant's counsel. The order was consistent with the reasoning in the letter opinion but elaborated on the basis of the ruling. Whereas the letter opinion had been silent as to whether the court was

ruling on defendant's "counterclaim" or "defense" regarding settlement and compromise, the order explicitly stated that, in addition to plaintiffs' claim being barred by the statute of limitations, "Defendants are entitled to a dismissal of Plaintiffs' claims *based upon their defense* that Plaintiffs and Defendants entered into a negotiable settlement agreement that is both valid and enforceable. Said agreement included a general mutual release that bars Plaintiffs' claims." The court later entered a general judgment stating:

> "Based on the Order Granting Defendants' Motion for Summary Judgment on file herein which disposed of all claims between the parties, it is:

> "HEREBY ADJUDGED that Plaintiffs' claims against Defendants are dismissed with prejudice and that Defendants are awarded their costs and disbursements incurred herein, to be entered in a supplemental judgment."

Plaintiffs timely appealed that judgment.

## II.  ISSUES ON APPEAL

### A.  *Assignments of Error and Preservation*

In their opening brief, plaintiffs raise two assignments of error. Plaintiffs' first assignment of error is straightforward and concerns the court's ruling on the statute of limitations. Their second assignment, however, is more complicated as the result of some procedural irregularities. In the second assignment of error, plaintiffs assert that

> "[t]he trial court only granted summary judgment on defendants' affirmative defense of statute of limitations and declined to grant defendants summary judgment on their counterclaim for specific performance of a contract. Consequently, the trial court did not commit reversible error with respect to defendants' motion for summary judgment on their counterclaim. Nonetheless, the trial court's superfluous factual finding with respect to the contract was erroneous, legally and factually, and plaintiffs ask the Court to give the trial court some guidance on remand."

Following that assignment, plaintiffs develop four arguments as to why their claim for legal malpractice is not barred by the March 4 settlement agreement: (1) the scope of the release agreement is ambiguous and should be

resolved by the trier of fact; (2) there are questions of fact as to when the parties intended the release agreement to be legally binding; (3) defendant's law firm—as opposed to defendant himself—was not released from malpractice liability; and (4) "[t]he Court, trying this *de novo* and sitting in equity, should not order specific performance because of [defendant's] overreaching, and the harshness and oppressiveness that result would cause." (Boldface omitted.)

In his response brief, defendant addresses plaintiffs' first assignment of error on the merits, arguing that the trial court correctly ruled that plaintiffs' claim was barred by the statute of limitations. Defendant also argues, in the alternative, that we should not even reach the merits of the trial court's ruling on the statute-of-limitations issue, because "there is an independent and unchallenged basis for affirming the trial court's dismissal of plaintiffs' claims"—namely, the court's ruling on defendant's affirmative defense of compromise and settlement. Defendant argues that, notwithstanding the second assignment of error, which addresses the *counterclaim* regarding settlement and compromise, plaintiffs "did not object to the form of the trial court's Order and have not assigned error to the trial court's granting defendants summary judgment on their *affirmative defense* of compromise and settlement." (Emphasis added.) Furthermore, defendant argues that, even if we were to treat the second assignment of error as a challenge to the court's summary judgment ruling on the affirmative defense of settlement and compromise, some of the arguments that plaintiffs now advance on appeal are unpreserved.

In reply, plaintiffs suggest that we should disregard any technical defects in their second assignment of error, because it is clear from the briefing that they intended to assign error to the trial court's ruling regarding settlement and compromise. Moreover, plaintiffs argue that defendant, after intentionally styling the issue of settlement and compromise as a counterclaim for summary judgment, should not be permitted to "rewrite what actually happened below" in an effort "[t]o avoid being held to the burden of production required for summary judgment on a claim for specific performance of a contract (by clear and convincing evidence),

and to avoid potentially having this case decided *de novo* on a deficient record." Finally, plaintiffs argue that they properly preserved the issues raised on appeal by arguing to the trial court that "they did not agree to release their legal malpractice claims and that any release would not be enforceable until a final writing was approved. * * * *See Gadda v. Gadda*, 341 Or 1, 7, 136 P3d 1099 (2006) (allowing party to raise new alternative argument on appeal where party preserved the underlying 'broad legal issue')."

Having considered the parties' respective positions, we conclude that plaintiffs have adequately challenged both bases of the court's summary judgment ruling, so as to permit appellate review of both bases for the ruling. Although we are not persuaded that defendant has attempted to "rewrite" the court's ruling to avoid a different standard of review,[3] plaintiffs' intent to challenge both aspects of the court's summary judgment ruling—statute of limitations and the release agreement—is readily apparent from the opening brief. It is also clear that defendant has not been prejudiced by the fact that plaintiffs referred to the court's ruling on a "counterclaim" rather than its ruling on an affirmative defense. Defendant's summary judgment briefing invited that characterization. In his motion for summary judgment, defendant sought judgment as a matter of law on his counterclaim for specific performance of the parties' settlement agreement and mutual release. And defendant concedes that the pertinent legal analysis is the same, regardless of whether the trial court's summary judgment ruling is viewed as ruling on a counterclaim or is, instead, viewed as ruling on an affirmative defense. Accordingly, we treat

---

[3] Plaintiffs' perception that defendant might avoid *de novo* review and the clear-and-convincing standard are premised on a misunderstanding of the role of the trial and appellate courts with regard to summary judgment. Neither court, when considering whether a party is entitled to judgment as a matter of law at the summary-judgment stage of the case, is permitted to make factual findings or weigh the evidence, regardless of whether the underlying claim or requested relief is equitable in nature. *See Brown v. Guard Publishing Co.*, 267 Or App 552, 562, 341 P3d 145 (2014) (explaining that the court does not apply *de novo* review in the context of a motion for summary judgment); *Faber v. Asplundh Tree Expert Co.*, 106 Or App 601, 606, 810 P2d 384, *rev den*, 312 Or 80 (1991) (explaining that the clear-and-convincing standard of proof "relates to how a jury weighs the evidence, not to how a trial court assesses the capability of the evidence to establish facts").

plaintiffs' second assignment of error as a challenge to the trial court's grant of summary judgment based on the affirmative defense of settlement and compromise.[4]

That still leaves the question of preservation. On that question, we agree with defendant that plaintiffs have not wholly preserved the issues that they raise in support of their second assignment of error. Whether the source of the argument was an affirmative defense or a counterclaim, the legal issue before the court on summary judgment was clear to both parties and the trial court: Did plaintiffs and defendants enter into a release agreement that barred plaintiffs' negligence claim as a matter of law? The parties' arguments were joined on that issue below, and plaintiffs confined their arguments to whether there was a disputed issue of fact regarding aspects of contract *formation*: offer, meeting of the minds, consideration, and acceptance. At no point did plaintiffs suggest—as they now suggest on appeal—that the term "mutual general release" was ambiguous and would not cover malpractice; that the release only applied to defendant and not his law firm; or that there were other equitable reasons to excuse any breach of an agreement. Those issues are fundamentally different from the issue of whether the parties entered into an enforceable settlement, and were not fairly encompassed within the matters raised below. As a result, we conclude that they are not properly before us on appeal. *See Blankenship v. Smalley*, 262 Or App 240, 250, 324 P3d 573 (2014) (declining to address unpreserved argument where the appellant "did not fairly present the trial court with the contentions that she now makes on appeal in a way that would have allowed it to understand and avoid

---

[4] Even assuming that the court's alternative reasoning required a separate assignment of error under these circumstances, *but see Marc Nelson Oil Products, Inc. v. Grim Logging Co.*, 199 Or App 73, 75 n 1, 110 P3d 120, *adh'd to as modified on recons*, 200 Or App 239, 115 P3d 935 (2005) ("Assignments of error * * * are to be directed against rulings by the trial court, not against components of the trial court's reasoning or analysis that underlie that ruling."), we would disregard that defect in this case. *See Smith v. Bend Metropolitan Park and Recreation*, 247 Or App 187, 192 n 2, 268 P3d 789 (2011) (considering "improper assignments of error" where "it is clear from the briefs, including the described standards of review and argument, that plaintiff intends to assign error to the trial court's rulings on summary judgment," and treating "the assignments as having challenged those rulings"); *Hoffman v. Deschutes County*, 237 Or App 531, 539 n 5, 240 P3d 79, *rev den*, 349 Or 479 (2010) (disregarding imprecision in assignment of error where the relevant issues were adequately framed for review).

or correct any error").[5] Accordingly, we address only that part of plaintiffs' second assignment of error that concerns whether the parties entered into an enforceable "mutual general release."

## B.   *Enforceability of Release Agreement*

### 1.   *Standard of Review*

On review of a trial court's grant of summary judgment, "we view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to * * * the party opposing the motion." *Jones*, 325 Or at 408. Summary judgment is proper only "if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 638, 20 P3d 180 (2001) (citing ORCP 47 C).

Because defendant, the moving party, would have had the burden of proof at trial on his affirmative defense of settlement and compromise, he bore the burden of producing evidence to establish that defense as a matter of law at the summary judgment stage. *Sunset Presbyterian Church v. Brockamp & Jaeger*, 254 Or App 24, 30, 295 P3d 62, 66 (2012), *rev'd on other grounds*, 355 Or 286, 325 P3d 730 (2014). That means that our task on appeal, as circumscribed by our standard of review, is to determine whether the uncontroverted evidence presented by defendant in support of his motion for summary judgment is such that all reasonable factfinders would have to find in defendant's favor on his affirmative defense of settlement and compromise. Said another way, we must be able to conclude that no reasonable factfinder could reject defendant's defense.

### 2.   *Analysis*

As detailed above, the issue before the trial court, as framed by the parties, was whether the "mutual general

---

[5] Although plaintiffs, by way of a footnote, suggest that the preservation requirement should give way entirely in this case because of uncertainty surrounding the nature of the court's ruling, they do not develop any argument in that regard—and, given the overlap between the affirmative defense and counterclaim, we are persuaded that we should adhere to ordinary principles of preservation under the circumstances of this case.

release" was an enforceable agreement between plaintiffs and defendant. Plaintiffs did not dispute below that they had reached a settlement agreement with defendant, or assert that Tucker's email to defendant detailing the terms of the settlement was inaccurate or otherwise did not reflect the terms of the parties' agreement. Instead, plaintiffs argued below, and now argue on appeal, that the parties' agreed-to "mutual general release" was not valid and enforceable until they agreed on the exact terms and form of the release agreement. We, like the trial court, disagree with that view of the law on this record.

"Whether a contract existed is a question of law." *Ken Hood Construction v. Pacific Coast Construction*, 201 Or App 568, 577, 120 P3d 6 (2005), *adh'd to as modified on recons*, 203 Or App 768, 126 P3d 1254, *rev den*, 341 Or 366 (2006). A "contract is most commonly formed by an offer, an acceptance of that offer, and an exchange of consideration." *Moro v. State of Oregon*, 357 Or 167, 196, 351 P3d 1 (2015); *see Homestyle Direct, LLC v. DHS*, 354 Or 253, 262, 311 P3d 487 (2013) (describing contract formation). "Ordinarily, an offer contains a promise that will become enforceable only when the offer is accepted." *Moro*, 357 Or at 196. Additionally, the parties must manifest "mutual assent to the exchange and a consideration." *Homestyle Direct, LLC*, 354 Or at 262 (quoting *Restatement (Second) of Contracts* § 17(1) (1981)). "Mutual assent, historically referred to as the 'meeting of the minds,' may be expressed in words or inferred from the actions of the parties." *Id.* (quoting *Bennett v. Farmers Ins. Co.*, 332 Or 138, 148, 26 P3d 785 (2001)). Consideration, in turn, "is defined as 'some right, interest, profit or benefit or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other.'" *Id.* (quoting *Shelley v. Portland Tug & Barge Co.*, 158 Or 377, 387, 76 P2d 477 (1938)).

In assessing whether a contract was formed, Oregon applies an objective theory of contracts. *See State v. Heisser*, 350 Or 12, 25-26, 249 P3d 113 (2011). "'The law of contracts is not concerned with the parties' undisclosed intents and ideas. It gives heed only to their communications and overt acts.'" *Id.* at 25 (quoting *Kitzke v. Turnidge*, 209 Or 563, 573, 307 P2d 522 (1957)). In other words,

"'[a]greement consists of mutual expressions; it does not consist of harmonious intentions or states of mind.'" *Id.* (quoting *Corbin on Contracts* § 19); *see also Kabil Developments Corp. v. Mignot*, 279 Or 151, 157, 566 P2d 505 (1977) (concluding that the correct test for contract formation examines "manifested assent regardless of subjective intent").

If the parties' communications and actions manifest assent to be bound by promises, they will form a contract unless the promises are "so indefinite that a court cannot determine what the parties intended." *Logan v. D. W. Sivers Co.*, 343 Or 339, 347, 169 P3d 1255 (2007). In determining whether a promise is too indefinite to form a contract, courts do not focus on labels, such as whether "it properly may be categorized as 'preliminary,' or an 'agreement to agree,' or an 'agreement to negotiate.'" *Id.* Instead, "it is the contents of the agreement and what the parties intended that is important," and whether the agreement "contain[s] an exchange of promises that the parties intended to be binding and that are sufficiently definite to allow a jury or court to determine what is required of each party." *Id.*

Thus, even where parties contemplate that additional documents will be finalized in the future, the question remains one of mutual assent:

> "Where parties agree to reduce their agreement to writing, the question arises as to whether their negotiations constitute a contract. * * * [W]here all the substantial terms of a contract have been agreed on and there is nothing left for future settlement, the fact alone that it was the understanding that the contract should be formally drawn up and put in writing does not leave the transaction incomplete and without binding force, in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed. Where, however, the writing is regarded as a prerequisite to the closing of the contract, the agreement does not become binding if there has been a failure to reduce it to writing."

*Britt v. Thorsen*, 258 Or 135, 137-38, 481 P2d 352 (1971) (internal citations and quotation marks omitted). Applying that standard, we routinely have concluded that parties have entered binding and enforceable agreements (including settlement agreements), notwithstanding the fact that future

formalization in writing is contemplated, where the parties' communications demonstrate objectively that the parties have reached a mutual agreement. *See Dalton v. Robert Jahn Corp.*, 209 Or App 120, 134-35, 146 P3d 399 (2006), *rev den*, 342 Or 416 (2007) ("That * * * additional documents needed to be finalized was not a bar to the existence of a binding contract but, rather, a term of the contract in the sense that the parties had agreed to create the documents.").

For example, in *Kaiser Foundation Health Plan v. Doe*, 136 Or App 566, 571-72, 903 P2d 375 (1995), *adh'd to as modified on recons*, 138 Or App 428, 908 P2d 850, *rev den*, 324 Or 394 (1996), we held that the defendant's subjective belief that she would not be bound by the settlement prior to reducing the agreement to writing was irrelevant, because the defendant's actions objectively manifested that she intended to be bound on the night of the agreement. The plaintiff's attorney had made it clear that the defendant "was required either to accept or to reject the proposed settlement that night even though [the defendant] had requested several days within which to consider it," the defendant authorized her attorney to "accept the offer before she went to dinner," and the defendant's attorney notified the mediator thereafter that the parties "had settled the case." *Id.* at 572.

Likewise, in *Hughes v. Misar*, 189 Or App 258, 265, 76 P3d 111 (2003), *rev den*, 336 Or 615 (2004), we held that a defendant's testimony that he did not intend his signature to make the settlement immediately binding did not affect that conclusion, because the defendant had not communicated that reservation at the time. We explained that, "[i]n the absence of some communicated condition regarding the postponement of the binding effect of their mutual assent, such as a provision in the terms sheets or a statement by one of the parties, the objective meaning of the parties' action was that the agreed terms were binding immediately." *Id.*

In this case, the uncontroverted evidence establishes that, after plaintiffs hired an attorney to represent them in pursuing remedies against defendant and consulted a malpractice lawyer about defendant's conduct, the parties objectively manifested their mutual intent to enter into a binding "mutual general release" on March 4, 2010,

conditioned only on the closing of the sale of the ranch and quarry to a third party. The email from plaintiffs' counsel explicitly stated that it was to "confirm[] our settlement," of which the "mutual general release" was one among many terms. Plaintiffs' counsel indicated that, upon defendant's confirmation of the terms in the email, plaintiffs' counsel would set the agreement in motion, "email[ing] new instructions to the escrow company and instruct[ing] [plaintiffs] to pick up the check and go to the title company." Defendant responded, "I accept," and then emphasized that timing was of the essence: "We must get it done today. This is holding up closing as we 'speak.'"

Although the agreement indicated that a written release would follow—and tied the release of the check to that agreement—there is no suggestion that the parties intended the agreement to be tentative or unenforceable until the signed release was obtained. To the contrary, every indication from the parties' actions objectively manifested their mutual understanding that their dispute had been settled, notwithstanding the lack of a written release agreement. After receiving the $15,000 check from defendant, plaintiffs' counsel acknowledged that defendant "will be preparing the mutual release" but nevertheless stated, "This was not an easy matter for you or [plaintiffs]. I am glad it is over." Later emails from plaintiffs' counsel about revisions to the form of release likewise indicated that the settlement had already been achieved, and that the parties were memorializing the agreement, not negotiating it. In fact, one of the last emails from plaintiffs' counsel to defendant indicated that only ministerial tasks remained after his requested changes were made to the form—obtaining duplicate signatures from both sides and releasing the check. Plaintiffs' subjective belief that there were material terms remaining to be negotiated—a belief that was never communicated to defendant—does not make the agreement unenforceable. Under an objective theory of contracts, there is no genuine issue of material fact on this record as to whether the parties intended to be bound by their March 4 agreement to enter into a mutual general release.[6]

---

[6] Plaintiffs do not argue that Tucker, their attorney, was somehow without authority to provide the objective manifestations of assent that he did. *See*

Having concluded that the parties intended to be bound by their agreement to enter into a "mutual general release," the remaining question is whether that term is too indefinite to be enforced. It is not. A "general release" is understood by lawyers (and perhaps even by laypersons) to refer to a release of all then-existing claims within the contemplation of the parties in general, as opposed to a release of specific claims. *See, e.g., Ristau v. Wescold, Inc.*, 318 Or 383, 389, 868 P2d 1331 (1994) ("As this court held in *Glickman v. Weston*, 140 Or 117, 125, 11 P2d 281, 12 P2d 1005 (1932), a general release from all claims and demands is sufficient to bar a specific claim, unless the claim is excepted from the release agreement."); *Release*, 66 Am Jur 2d § 28 (2005) ("A general release, not restricted by its terms to particular claims or demands, ordinarily covers all claims and demands due at the time of its execution which were within the contemplation of the parties." (Footnotes omitted.)); *Release*, 76 CJS § 71 (2008) ("A general release, not restricted by its terms to particular claims or demands, ordinarily covers all claims and demands which have matured at the time of its execution and which were within the contemplation of the parties. A general release disposes of the entire subject matter involved. Any existing liabilities intended to be excepted from such a release should be expressly set forth therein." (Footnotes omitted.)); *see also* ORS 17.075 (concerning an employer's ability to obtain a "general release of liability" from injured employees). By agreeing to a "mutual general release," the parties agreed to release generally all claims and demands against one other. *See Black's Law Dictionary* 1403 (9th ed 2009) (defining a "mutual release" as a "simultaneous exchange of releases of legal claims held by two or more parties against each other"). Even if the parties did not explicitly agree on the exact form of the release, the agreement to enter into a "mutual general release" was "sufficiently definite to allow a jury or court to determine what is required of each party" in these circumstances. *Logan*, 343 Or at 347.

---

*MacDonald v. Cottle*, 133 Or App 35, 40, 889 P2d 1320, *rev den*, 321 Or 268, 895 P2d 1362 (1995) ("[I]t is well settled that the conduct of an attorney who acts within the scope of his or her authority will be imputed to the client.").

In sum, the trial court correctly concluded that plaintiffs and defendant entered into a valid and enforceable mutual general release agreement that bars plaintiffs' claim, and we affirm the trial court's grant of summary judgment on that basis.[7]

Affirmed.

.

---

[7] Because we affirm on the basis of the release, we do not address the trial court's alternative ruling that plaintiffs' negligence claim was filed beyond the statute of limitations.