Argued and submitted October 30, 2018, reversed and remanded
September 30, 2020

Darin ROWDEN;
Natalie Rowden, individually and as
guardian *ad litem* on behalf of her minor children
Terra Rowden, Myka Rowden, and Hans Rowden;
and Hailey Rowden,
*Plaintiffs-Appellants,*

*v.*

HOGAN WOODS, LLC,
an Oregon limited liability company;
James P. McNutt; Robert E. McNutt; Michael W. McNutt;
and The Ronald E. McNutt Family Trust,
*Defendants-Respondents.*

Multnomah County Circuit Court
15CV09483; A165292

476 P3d 485

Plaintiffs Darin and Natalie Rowden worked as property managers at apartments owned by defendant Hogan Woods, LLC, and they lived on site with their four children, who are also plaintiffs in this case. All of the plaintiffs experienced health issues that they attributed to mold in the apartments, and Darin and Natalie filed occupational disease claims, which the Workers' Compensation Board rejected on the ground that neither of them proved the "existence of an occupational disease related to claimant's alleged work exposure." Thereafter, plaintiffs brought this civil action against Hogan Woods, LLC, and its members and their family trust, alleging various claims arising out of the mold issues. The trial court granted summary judgment on all claims against Hogan Woods, LLC, largely on the ground that the board's decision had preclusive effect, and it further concluded that efforts to pierce the corporate veil of Hogan Woods, LLC, and hold its members and the trust liable were not ripe because there was not yet a judgment against the company. On appeal, plaintiffs argue that the trial court erred in giving the board's decision such sweeping effect and in dismissing claims against the members and the trust as unripe. Defendants respond that the trial court's rulings were correct and argue, as alternative bases for affirming part of the judgment, that Darin and Natalie's work as managers of the Hogan Woods apartments was not "inherently dangerous" for purposes of imposing liability under the Employer Liability Act (ELA) and that their claims under the Residential Landlord Tenant Act (RLTA) fail as a matter of law because they fall within a statutory exception for "[o]ccupancy by an employee of a landlord whose right to occupancy is conditional upon employment in and about the premises," ORS 90.110(7). *Held*: The trial court erred in granting summary judgment on the basis of issue preclusion, because it is impossible to discern from the board's orders whether a finding of "no exposure" to mold and toxins was made separately from the claimants' burden under the major contributing cause standard or was somehow essential to the board's analysis. Defendants' arguments concerning the RLTA and ELA claims did not provide an alternative basis on which

to affirm the court's dismissal of those claims, because they presented factual disputes that could not be resolved at the summary judgment stage. The trial court also erred in concluding that plaintiffs' Unlawful Fraudulent Transfer Act claim and veil-piercing theory were unripe; plaintiffs were not required to have a judgment in hand against Hogan Woods, LLC, before pursuing a fraudulent transfer claim or veil-piercing theory.

Reversed and remanded.

Thomas M. Christ, Judge pro tempore. (Limited Judgment)

Nan G. Waller, Judge. (General Judgment)

Adam S. Heder argued the cause for appellants. Also on the briefs was Roger K. Harris.

Lori K. DeDobbelaere argued the cause for respondents. Also on the brief was Heinson & DeDobbelaere LLC.

Before Lagesen, Presiding Judge, and DeVore, Judge, and James, Judge.

JAMES, J.

Reversed and remanded.

DeVore, J., concurring in part, dissenting in part.

**JAMES, J.**

Plaintiffs Darin and Natalie Rowden worked as property managers at apartments owned by defendant Hogan Woods, LLC, and they lived on site with their four children, also plaintiffs in this case. All of the plaintiffs experienced health issues that they attributed to mold in the apartments, and Darin and Natalie filed occupational disease claims, which the Workers' Compensation Board rejected on the ground that neither of them proved the "existence of an occupational disease related to claimant's alleged work exposure." Thereafter, plaintiffs brought this civil action against Hogan Woods, LLC, and its members and their family trust, alleging various claims arising out of the mold issues. The trial court granted summary judgment on claims against Hogan Woods, LLC, largely on the ground that the decision of the Workers' Compensation Board had preclusive effect, and it further concluded that efforts to pierce the corporate veil of Hogan Woods, LLC, and hold its members and the trust liable were not ripe because there was not yet a judgment against the company.

Plaintiffs now appeal, arguing that the trial court erred in giving the board's decision such sweeping effect and in dismissing claims against the members and the trust as unripe. For the reasons explained below, we conclude that the trial court erred in giving preclusive effect to the board's decision and in dismissing the claims against the company's members and the trust as premature. We therefore reverse and remand for further proceedings.

## I.   BACKGROUND

Because this appeal arises from the trial court's grant of summary judgment, we state the historical facts in the light most favorable to plaintiffs, the nonmoving party. *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997).

In 1998, Darin and Natalie Rowden were hired as on-site managers of the Hogan Woods Apartments. At that time, the apartment complex was owned and operated by defendants James P. McNutt, Robert E. McNutt, Michael

McNutt, and the Ronald E. McNutt Family Trust (collectively, "the McNutt family" or "McNutt defendants"). In 1999, the McNutt family transferred the apartments to Hogan Woods, LLC.

Initially, Darin and Natalie were employed by a third-party property manager, but, beginning in 2005, they became employees of Hogan Woods, LLC. Their employment duties included everything associated with managing and leasing apartments, such as getting units ready for rental, showing units and filling out leasing paperwork, managing maintenance, and handling payroll, accounts payable, rent collection, and deposits. They had an office at the apartment complex and, as part of their compensation package, they lived rent free with their four children in one of the apartments, Unit 112.

After moving into that unit, Darin developed allergies, skin rashes, and bronchitis, and he noticed mold in the apartment. Between 2006 and 2007, Natalie experienced fatigue, headaches, and other symptoms. She likewise observed mold in the apartment and made some efforts to remove it, including cleaning, painting, and using a dehumidifier, but the mold returned.

In February 2014, Darin and Natalie informed defendants that they could no longer live at Hogan Woods because of recurring mold problems there. The Rowden family then moved out of Unit 112 to an off-site residence, but for several months Darin and Natalie continued to work in the office. Hogan Woods, LLC, reimbursed the Rowdens for the cost of temporary motel housing and then signed a lease on their behalf with another entity to meet its "compensation package" obligations as Darin and Natalie continued to manage the Hogan Woods Apartments from the off-site residence. In July 2014, Darin and Natalie informed defendants that their doctor had advised them not to return to Hogan Woods or come in contact with anything from Hogan Woods, including mail and rent checks. A few months later, on November 8, 2014, Michael McNutt, the managing member of Hogan Woods, LLC, sent Darin and Natalie a letter terminating their employment.

That same month, Darin and Natalie filed workers' compensation claims for an occupational disease based on "toxic exposure" during their employment for Hogan Woods, LLC. Sedgwick Claims Management Services denied the claims, and Darin and Natalie requested hearings before an administrative law judge (ALJ). The ALJ upheld the denials and Darin and Natalie then appealed those decisions to the Workers' Compensation Board.

The board issued its final order as to Natalie in July 2016 and as to Darin in August 2016. Those orders, which we later discuss in greater detail, affirmed the ALJ's orders. With regard to Natalie, the board ultimately concluded that the record before it did not "persuasively establish that claimant's apartment was 'severely water damaged' or that there were 'elevated levels' of trichothecenes (mycotoxins) in the apartment," and, therefore, that "the record does not persuasively establish the existence of an occupational disease related to claimant's alleged work exposure to trichothecenes/mycotoxins." With regard to Darin, the board similarly concluded that it was "not persuaded that this record establishes the existence of an occupational disease related to claimant's alleged work exposure to mold/mycotoxins." Neither Darin nor Natalie sought judicial review of the board's orders.

Meanwhile, plaintiffs filed this civil action in April 2015 against Hogan Woods, LLC, and against the McNutt family on the ground that the McNutt family had used Hogan Woods, LLC, as their alter ego without regard to corporate form.[1] Specifically, Darin and Natalie alleged claims against all defendants based on the Employer Liability Act (ELA), the Oregon Safe Employment Act (OSEA), Oregon's Residential Landlord Tenant Act (RLTA), wrongful discharge, unlawful employment discrimination, and breach of contract; and, along with their four children, they alleged

---

[1] Because Hogan Woods, LLC, was a noncomplying employer under the workers' compensation statutes, the exclusive remedy and timing restrictions on filing a civil action under the workers' compensation statutes were not applicable. *See* ORS 656.020 ("Except for the provisions of ORS 656.578 to 656.593 and this section, such noncomplying employer is liable as the noncomplying employer would have been if this chapter had never been enacted.").

negligence, conversion, and trespass-to-chattels claims against defendants.

In May 2016, Hogan Woods, LLC, sold its only asset, the Hogan Woods Apartments, and distributed the sale proceeds to its members, the McNutt family. Plaintiffs then amended their complaint to add a claim that the distribution of proceeds violated the Uniform Fraudulent Transfer Act (UFTA), ORS 95.200 to 95.310.

Thereafter, defendants filed motions for summary judgment against the claims on various grounds, and the McNutt family filed an additional motion directed at plaintiffs' veil-piercing theory. As relevant to this appeal, defendants argued that the Workers' Compensation Board had determined that plaintiffs had not suffered a toxic exposure at the apartments—a determination that was entitled to preclusive effect and prevented them from proving the opposite in a civil action; that the RLTA claim failed as a matter of law because Darin and Natalie fell within a statutory exception for "[o]ccupancy by an employee of a landlord whose right to occupancy is conditional upon employment in and about the premises," ORS 90.110(7); and that their work as managers of the Hogan Woods Apartments was not "inherently dangerous" for purposes of imposing liability under the ELA. With regard to the veil-piercing theory, the McNutt defendants argued that there was no evidence that they had engaged in improper and deceitful behavior that would justify the "extraordinary remedy" of piercing the corporate veil of Hogan Woods, LLC.

At the outset of the hearing on the various motions, the court *sua sponte* raised concerns that the veil-piercing theory was premature because plaintiffs had not obtained a judgment against the company that it was unable to satisfy. The parties then turned to the other bases for defendants' motions, including whether the Workers' Compensation Board's decision was preclusive. Among other things, plaintiffs argued that the standard applied by the board, which turned on causation under a "major contributing cause" standard, was different from whether they could establish toxic exposure for purposes of their civil claims.

After the hearing, the trial court issued a letter opinion in which it ruled almost entirely in favor of defendants. The court granted "summary judgment to defendants on all claims and parts of claims that depend on a finding that plaintiffs were injured by exposure to mycotoxins, because the Workers' Compensation Board found that plaintiffs Darin and Natalie Rowden were *not* exposed to them and that finding is preclusive." (Emphasis in original.) The court explained that "[t]he Rowden children are precluded too," because they were in privity with their parents.

With regard to the UFTA claim and veil-piercing theory, the court did not reach the parties' arguments. Instead, as it had signaled during the hearing, the court was of the view that they were not justiciable "because they depend on plaintiffs holding an uncollectible judgment against the defendant company on one or more of the claims, and plaintiffs don't hold a judgment now." The court stated that its dismissal of those claims, on the basis of ripeness, was without prejudice.

After the court's ruling on the summary judgment motions, plaintiffs moved to amend their complaint to omit claims and references to injury caused by mycotoxins, asserting that their claims alleged injuries resulting from toxic exposure beyond mycotoxins. Defendants objected to the proposed amendment, arguing that the summary judgment ruling had disposed of plaintiffs' claims in their entirety, not merely allegations regarding mycotoxins.

The court then issued a letter opinion clarifying the basis of its summary judgment ruling. The court explained that it did not "share plaintiffs' interpretation of the current complaint, the Board's orders, or [the] ruling." The court stated that it had intended to "dismiss all of, not just parts of, the [RLTA], ELL, SEA, negligence, conversion, and trespass-to-chattel claims, as well as paragraphs 55 a, b, and d of the contract claim, which I construed to contain allegations tied to the mycotoxin injuries."

Defendants then submitted a limited judgment based on that clarification, the court concluded that the motion to amend was moot, and plaintiffs voluntarily dismissed the

balance of their claims, resulting in the entry of a general judgment.[2] Plaintiffs now appeal, assigning error to the court's summary judgment rulings.

## II.   ANALYSIS

### A.   *Issue Preclusion*

In their first assignment of error, plaintiffs argue that the Workers' Compensation Board applied the "major contributing cause" standard, as it was required to do for occupational diseases, and that the trial court therefore erred in giving that decision preclusive effect. Plaintiffs advance two distinct and independent arguments within the assignment. First, they argue that the court's application of issue preclusion conflicts with the policy in ORS 656.019(1), which provides that "[a]n injured worker may pursue a civil negligence action for a work-related injury that has been determined to be not compensable because the worker has failed to establish that a work-related incident was the major contributing cause of the worker's injury only after an order determining that the claim is not compensable has become final." Second, plaintiffs argue that the "purported finding cited by the trial court—*i.e.*, that Darin and Natalie Rowden were not exposed to mycotoxins—was not *essential* to the underlying question in front of the board; that is, whether the Rowdens' workplace exposure was the 'major contributing cause' of their injuries." (Emphasis in original.) That is important because a determination of causation under the major contributing cause standard—a higher standard than would apply under the common law—would not be entitled to preclusive effect on the issue of causation in a negligence action. *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 134, 23 P3d 333 (2001), *overruled on other grounds by Horton v. OHSU*, 359 Or 168, 376 P3d 998 (2016) (explaining that, under the major contributing cause standard, workers' compensation law "does not provide compensation for a work-related incident that was only a contributing cause of the worker['s] injury" and therefore is not coextensive with a common-law negligence cause of action).

---

[2] The summary judgment rulings were decided by Judge pro tempore Thomas M. Christ, whereas the motion to amend was decided by Judge Leslie G. Bottomly.

With respect to the first of those contentions, defendants argue that plaintiffs did not rely on ORS 656.019(1) below, so we should reject it on preservation grounds. With regard to the second, they contend that the board's decision was not based on the major contributing cause standard but instead on a determination that plaintiffs failed to show they were exposed to mycotoxins at Hogan Woods.

For the reasons explained below, we agree with plaintiffs that statements in the board's orders regarding exposure to mycotoxins were not factual findings that were essential to its determinations. We therefore reverse the trial court's ruling on that basis and do not reach their arguments regarding the legal effect of ORS 656.019(1).[3]

Although issue preclusion can have statutory or constitutional sources, this case involves the common-law doctrine of issue preclusion. *See Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 103-04, 862 P2d 1293 (1993) (explaining that, "[b]ecause this case involves the preclusive effect of an administrative proceeding, it is governed by the common law"). As the court explained in *Nelson*, common-law issue preclusion is a doctrine that promotes finality and judicial economy by preventing parties from relitigating an issue of law or fact that has been fully addressed in another proceeding. It applies only when (1) the issue in the two proceedings is identical; (2) the issue was actually litigated and was essential to a final decision on the merits in the prior proceeding; (3) the party sought to be precluded has had a full and fair opportunity to be heard on that issue; (4) the party sought to be precluded was a party or was in privity with a party to the prior proceeding; and (5) the prior

---

[3] Plaintiffs' alternative contention is premised on the view that ORS 656.019(1) "is the grant of a substantive right and remedy not a mere procedural technicality." But, as the Supreme Court observed in *Bundy v. NuStar GP, LLC*, 362 Or 282, 298, 407 P3d 801 (2017), the text is ambiguous on that point. The court in *Bundy* declined to resolve that ambiguity, "reserv[ing] for another day *** the comprehensive statutory analysis needed to resolve whether the legislature intended ORS 656.019 to function as a substantive exception to the exclusive remedy provision." *Id.* Here, plaintiffs provide only a cursory statutory analysis and do not address the textual ambiguity identified in *Bundy*. Even assuming that plaintiffs did enough to put the issue before the trial court, we decline to interpret ORS 656.019(1) where plaintiffs' alternative argument provides an independent basis for reversal.

proceeding was the type of proceeding to which this court will give preclusive effect. 318 Or at 104.

Plaintiffs contend that defendants failed to prove the second *Nelson* factor—that a finding that the plaintiffs were not exposed to mycotoxins was essential to the board's orders denying compensation. That contention turns on the nature of the board's task in determining an occupational disease, and on the specifics of the board's orders concerning Natalie and Darin.

Under the Workers' Compensation Law, an "occupational disease" means "any disease or infection arising out of and in the course of employment *caused by substances or activities to which an employee is not ordinarily subjected or exposed* other than during a period of regular actual employment therein, and which requires medical services or results in disability or death \*\*\*." ORS 656.802(1) (emphasis added). ORS 656.802(2) imposes specific proof requirements for occupational disease claims, including that "[t]he worker must prove that *employment conditions were the major contributing cause* of the disease," ORS 656.802(2)(a), and that "[e]xistence of an occupational disease or worsening of a preexisting disease must be established by *medical evidence supported by objective findings*." (Emphases added.) Thus, there are layered causation questions in play when the board considers the compensability of an occupational disease claim based on toxic exposure.

With that framework in mind, we turn to the board's orders concerning Natalie's and Darin's workers' compensation claims. As noted above, their claims proceeded separately, and an ALJ, and then the board, issued separate orders in each case. In Natalie's case, the board's order begins by stating that the ALJ upheld the denial "of claimant's occupational disease claim for toxic exposure. On review, the issue is compensability. We affirm."

The order then includes a section titled "Findings of Fact," which begins by recounting mold inspection reports and doctor consultations, including by Dr. Hope, that predated Natalie's filing of an occupational disease claim for "toxic exposure" in November 2014. It then recounts medical evaluations performed by doctors after that point, including

Dr. Webb, a family practice specialist who diagnosed "mold exposure," and Dr. Bardana, a specialist in allergies and clinical immunology who concluded that there was "no scientific evidence supporting a diagnosis of mold (fungal) allergy, mold-related infection (mycoses), or mycotoxicosis as a result of [claimant's] work and exposures at [the] apartment complex." The "Factual Findings" conclude with a recitation of the competing medical views on toxic exposure, including that "Dr. Hope disagreed with Dr. Bardana's opinion. Based on claimant's history, 'lab work,' symptoms, and three environmental evaluations, Dr. Hope concluded that claimant's work exposure was the major contributing cause of her 'mold/mycotoxin exposure' and need for treatment." (Internal footnote omitted.)

The next section of the board's order in Natalie's case, which is captioned "Conclusions of Law and Opinion," begins by characterizing the ALJ's order and the issues before the board. It states:

"[T]he ALJ concluded that there was insufficient evidence to support a conclusion that claimant had suffered a toxic exposure that would cause a disease resulting in medical treatment and/or disability. On review, claimant contends that the record establishes that she was exposed to elevated levels of toxin-producing mold and that Dr. Hope's opinion establishes medical causation. For the following reasons, we agree with the ALJ's conclusion."

The order then recounts a claimant's burden under ORS 656.802(1)(a) and (2)(a), and it links the major contributing cause standard, work exposure, and medical causation:

"Claimant bears the burden of proving *that her work exposure was the major contributing cause of her condition*. ORS 656.266(1); ORS 656.802(1)(a); ORS 656.802(2)(a). Although she need not prove a specific diagnosis to prove the compensability of an initial claim, she must prove the existence of her occupational disease 'by medical evidence supported by objective findings.' ORS 656.802(2)(d); *see Tripp v. Ridge Runner Timber Services*, 89 Or App 355, 358, 749 P2d 586 (1988); *Carl A. Lorenz*, 59 Van Natta 1754, 1758 (2007) (compensability not proven where the existence of the claimed occupational disease was not established). Claimant must prove legal and medical causation

by a preponderance of the evidence. *See Harris v. Farmers' Co-op Creamery*, 53 Or App 618, 621, 632 P2d 1299 (1981). 'Legal causation' is established by showing that she was exposed to employment conditions that were potentially causal; *whether that exposure caused her condition is a question of medical causation. Darla Litten*, 55 Van Natta 925, 926 (2003).

"Due to the conflicting medical opinions regarding the nature and cause of claimant's condition, these issues present complex medical questions that must be resolved by expert medical opinion. *See Uris v. Compensation Department*, 247 Or 420, 426, 427 P2d 753 (1967); *Barnett v. SAIF*, 122 Or App 279, 283, 857 P2d 228 (1993). We give more weight to those opinions that are well reasoned and based on complete information. *See Somers v. SAIF*, 77 Or App 259, 263, 712 P2d 179 (1986)."

(Emphases added.)

From there, the board's order discusses the evidence, ultimately concluding with these two paragraphs:

"After completing our review, based on the aforementioned reasoning, we conclude that this record does not persuasively establish that claimant's apartment was 'severely water damaged' or that there were 'elevated levels' of trichothecenes (mycotoxins) in the apartment.

"In sum, the record does not persuasively establish the existence of an occupational disease related to claimant's alleged work exposure to trichothecenes/mycotoxins. Accordingly, we affirm."

The board's order concerning Darin's claim is similarly structured, but it differs in a few respects. For instance, it describes the ALJ's ruling in a way that explicitly ties the ALJ's and board's ultimate decisions to the major contributing cause standard: "[T]he ALJ was not persuaded that claimant's exposure to mold or mycotoxins in his residence *was the major contributing cause of a disease resulting in disability or the need for medical treatment.* \*\*\* For the following reasons, we agree with the ALJ's determination that claimant has not established a compensable occupational disease." (Emphasis added.) Later, the order states, "For the following reasons, we are not persuaded that claimant proved the existence of an occupational disease or that

he was exposed to employment conditions that caused the disputed condition." And the last paragraph of the order states, "In sum, after conducting our review, based on the aforementioned reasoning, we are not persuaded that this record establishes the existence of an occupational disease related to claimant's alleged work exposure to mold/mycotoxins," followed by a footnote explaining why it had rejected Dr. Webb's conclusion that "the workplace was the major contributing cause of claimant's mold exposure and need for treatment."

The trial court understood those two orders to be based on "findings that Darin and Natalie were not exposed to elevated levels of toxin-producing mold." We reach a different conclusion. The question of toxic exposure was inextricably linked to Darin's and Natalie's burden to prove compensability under the major contributing cause standard, and the board's orders cannot be viewed as resting on an essential finding that there was no exposure—as opposed to their failure to prove, by medical evidence, that workplace exposure was the major contributing cause of their need for treatment.

First, as set out above, the board combined its discussion of the various causation standards, including the "major contributing cause" standard and medical causation, and it proceeded to analyze the compensability question almost exclusively in terms of the medical evidence. In fact, even the conclusions that defendants rely upon—for example, the board's conclusion that "this record does not persuasively establish that claimant's apartment was 'severely water damaged' or that there were 'elevated levels' of trichothecenes (mycotoxins) in the apartment"—are directly tied to medical evidence bearing on the "major contributing cause" standard. The phrases in quotes in the board's summation paragraph—"severely water damaged" and "elevated levels"—refer to assessments by Dr. Hope, who opined that toxic exposure was the major contributing cause of Natalie's occupational disease. She had "assessed [Natalie's] symptoms as consistent with her 'exposure to [a] severely water damaged apartment with extensive visible mold found to have very elevated levels of Stachybotrys and Aspergillus/Penicillium mold in multiple locations throughout the unit'"

and "urine mycotoxin testing *** positive for very elevated levels of Trichothecenes *** mostly likely secondary to exposure."

Second, we take the board at its word when it states that it was agreeing with the ALJ's conclusion that Darin had not persuasively established "that claimant's exposure to mold or mycotoxins in his residence was the major contributing cause of a disease resulting in disability or the need for medical treatment." That was the standard the board was required to apply, and its later analysis and conclusions—that "it was not persuaded that this record establishes the existence of an occupational disease *related to claimant's alleged work exposure* to mold/mycotoxins"—is consistent with the board having decided the matter under that heightened causation standard. (Emphasis added.)

And, third, ambiguity in the orders about Darin's and Natalie's critical failure of proof is itself a reason that the doctrine of issue preclusion is inapplicable. One of the key sentences relied upon by the trial court—"For the following reasons, we are not persuaded that claimant proved the existence of an occupational disease or that he was exposed to employment conditions that caused the disputed condition"—itself provides two possible bases for the order and can be understood different ways. On that point, the *Restatement (Second) of Judgments* section 27 comment i (June 2020 Update), provides a helpful discussion of some of the prudential considerations underlying the application of the common-law doctrine where ambiguity is present:

> "*Alternative determinations by court of first instance.* If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone. ***.
>
> "*****
>
> "There are *** persuasive reasons for analogizing the case to that of the nonessential determination [discussed in another comment]. First, a determination in the alternative may not have been as carefully or rigorously considered as it would have if it had been necessary to the result,

and in that sense it has some of the characteristics of dicta. Second, and of critical importance, the losing party, although entitled to appeal from both determinations, might be dissuaded from doing so because of the likelihood that at least one of them would be upheld and the other not even reached. If he were to appeal solely for the purpose of avoiding the application of the rule of issue preclusion, then the rule might be responsible for increasing the burdens of litigation on the parties and the courts rather than lightening those burdens."

Here, in light of the ambiguity in the order as a whole and the context of the references to "no exposure," some of those same prudential concerns are implicated. Under ORS 656.802, the question before the board was whether the claimants proved, by medical evidence, that toxic exposure was the major contributing cause of a disease resulting in disability or the need for medical treatment. It is impossible to discern from the board's order to what extent it was making rigorous findings about specific problems with the claimant's evidence that it had identified in the record, or whether it was assessing those failures cumulatively in light of the claimants' burden to "persuasively establish the existence of an occupational disease related to claimant's alleged work exposure to trichothecenes/mycotoxins." And, in the absence of a clear indication that a finding of "no exposure" was actually determined separately from the burden under the major contributing cause standard or was somehow necessary to the board's analysis, the doctrine of issue preclusion is inapplicable.[4]

For those reasons, we conclude that the trial court erred in granting summary judgment on the basis of issue preclusion, because the summary judgment record does not

---

[4] If the order were clear that the board had decided the question of "no exposure" as a factual matter separately from the major contributing cause standard, our analysis might be different and the prudential considerations in *Restatement* comment i might be inapplicable. *Cf. Westwood Const. Co. v. Hallmark Inns & Resorts, Inc.*, 182 Or App 624, 635-36, 50 P3d 238 (2002) (applying statutory issue preclusion and explaining that, where it is clear from the face of a judgment or order that a matter was actually determined in a prior case, it can be preclusive under ORS 43.160 even if not strictly "essential" to the tribunal's decision); *see also Harvey v. Getchell*, 190 Or 205, 215, 225 P2d 391 (1950) ("Certainty is an essential element, and unless it is shown that the judgment necessarily involved a determination of the fact sought to be concluded in the second suit, there will be no bar." (Internal quotation marks and citations omitted.)).

establish as a matter of law that a finding of "no exposure" was actually determined apart from the major contributing cause standard and was *essential* to the board's orders.[5]

B.   *Alternative Bases for Affirmance*

Defendants request that, in the event that we reverse the trial court's ruling on issue preclusion, we consider, as to two claims, two additional grounds that were raised in their motion for summary judgment but not reached by the trial court. We briefly address those contentions.

1.   *RLTA*

Defendants' first argument involves Darin and Natalie's RLTA claim. According to defendants, the Rowdens' tenancy was not protected by the RLTA under the terms of ORS 90.110(7). That statute provides, "Unless created to avoid the application of this chapter, the following arrangements are not governed by this chapter: *** (7) Occupancy by an employee of a landlord whose right to occupancy is conditional upon employment in and about the premises." Defendants point to our decision in *Montgomery v. Howard Johnson Inn, Gresham*, 228 Or App 315, 320, 208 P3d 503 (2009), in which we explained that the statute's text "simply refers to arrangements in which the employee's occupancy is 'subject to' or 'depend[s] on' the employee's employment in and around the employer's premises." In that case, we held that a former hotel employee's residence at the hotel was dependent on her employment and therefore fell within ORS 90.110(7); here, defendants argue that, "[j]ust as the plaintiff in *Montgomery* was living at defendant's premises because of her employment, Darin & Natalie Rowden were living at Hogan Woods because they were the on-site managers." As we explain below, defendants misconstrue the nature of the exception and our holding in *Montgomery.*

---

[5] Our disposition of the first assignment of error obviates the need to address plaintiffs' second assignment, which asserts that parts of their complaint referred to microbial contamination distinct from biotoxin contamination, and their third assignment, which asserts that the trial court erred in concluding that issue preclusion barred claims by the Rowden children. However, as to the latter, we question how administrative proceedings involving injuries to parents could be given preclusive effect with regard to claims by their children, where the children's harm from any levels of exposure was not at issue in the administrative proceedings and would have involved different medical evidence.

The record in this case shows that Hogan Woods Apartments, and Unit 112, are by their nature places that are ordinarily rented to and occupied by tenants for purposes of the RLTA. *See* ORS 90.100(47) (defining "tenant" to include "a person, including a roomer, entitled under a rental agreement to occupy a dwelling unit to the exclusion of others, including a dwelling unit owned, operated or controlled by a public housing authority," but not a "guest or temporary occupant"). Nothing in the record clearly establishes that the "right to occupancy" of Unit 112 at Hogan Woods is limited to employees by virtue of their work at Hogan Woods. That is in contrast to the room in *Montgomery*—a transient hotel room afforded permanent occupancy only by virtue of the employment arrangement.

As the party seeking to come within a statutory exception to the RLTA, defendants would have the burden of persuasion at trial on the applicability of that exception—that is, the burden to prove that Darin and Natalie's right to occupancy was conditioned upon their employment arrangement. *See* OEC 305 ("A party has the burden of persuasion as to each fact the existence or non-existence of which the law declares essential to the claim for relief or defense the party is asserting."); *e.g.*, *Johnson v. O'Malley Brothers Corp.*, 285 Or App 804, 816, 397 P3d 554, *rev den*, 362 Or 300 (2017) (explaining that the party seeking to rely on a statutory exception has the burden of persuasion and production on its applicability). Consequently, at the summary judgment stage, our task on appeal "is to determine whether the uncontroverted evidence presented by defendant[s] in support of [their] motion for summary judgment is such that all reasonable factfinders would have to find in defendant[s'] favor" on the applicability of the exception. *Wieck v. Hostetter*, 274 Or App 457, 470, 362 P3d 254 (2015). We cannot say that on this record.

The question is whether defendants' evidence compels a conclusion that, despite the nature of the apartment complex and its units, plaintiffs' right to occupancy was conditional on their employment rather than a landlord-tenant relationship. The evidence proffered by defendants is the employment agreements, the bottom of which state, "I also understand that my apartment rent credit is a condition of

employment and that in the event that my employment ends I may be required to vacate immediately."

That term in the employment agreements is ambiguous as to whether it describes a conditional right to occupancy as opposed to a conditional rent credit. The use of "may be required to vacate" is consistent with defendants' view that Darin and Natalie's right to occupancy at Hogan Woods was subject to the existence of the employment relationship. On the other hand, the use of the conditional phrase "may be required"—and the omission of any explicit reference to the right to occupancy similarly being a "condition of employment"—is also consistent with Darin and Natalie's understanding that they were occupying Hogan Woods as apartment tenants *separate and apart from* any conditions or terms of the employment agreements, and that they simply received a rent credit for their apartment that was conditional—one that could be used at any apartment they chose.[6]

As far as the latter interpretation, there is extrinsic evidence that occupancy at Hogan Woods and the rent credit were not intended by the parties to be coupled under the agreements. Specifically, there is evidence that the company treated occupancy and employment as independent issues: After Darin and Natalie moved out, they continued to be employed by Hogan Woods, LLC, the company reimbursed them for their costs of obtaining a hotel, and the company entered into a lease agreement on their behalf to meet its "compensation package" obligations for continued employment. Moreover, one of the members of Hogan Woods, LLC, testified during his deposition that he would "agree that for the time that the Rowdens were onsite managers there at Hogan Woods, they were also tenants of Hogan Woods, LLC." Given that deposition testimony, the nature of the apartment complex and its units, and the ambiguity in the agreement as to whether their occupancy, as opposed

---

[6] Contextually, there is no indication that severance would have automatically resulted in a loss of the right to occupancy at Hogan Woods. The employment agreements make explicit reference to turning over "any master keys, office keys, or any other property provided by Hogan Woods Apts, for use during the term of such employment" upon termination but make no similar mention of turning over keys to their *residence* as a consequence of termination.

to a rent credit, was a condition of employment, a factfinder could reject defendants' view that the Rowdens were conditionally occupying the property as employees. In other words, a reasonable factfinder could infer from the employment agreements that Darin and Natalie were allowed to occupy the apartments only as a condition of employment, but a factfinder would not be compelled to make that finding on this record.

For that reason, the case is readily distinguishable from the circumstances in *Montgomery*, in which the "[u]ndisputed evidence demonstrate[d] that plaintiff's right to occupancy on defendant's premises was conditional on her employment." 228 Or App at 322. In that case, there was not only testimony that the "plaintiff's ability to use the rooms at the hotel was conditioned on her continued employment, but the employment termination notice presented to plaintiff stated that she would have to vacate the premises following her last day of employment." *Id.* Moreover, the parties' prior conduct demonstrated "that plaintiff's right to occupancy on the premises was conditional on her employment. Two months before this dispute, plaintiff's first term of employment with defendant ended. She was told that she would have to vacate the premises and, although initially resistant, she eventually did so." *Id.* The evidence here does not similarly compel a conclusion that the Rowdens would have been required to vacate the premises—an apartment unit for tenants—had their employment ended before they voluntarily left.

The dissent would reach a different conclusion on that point. But its analysis fails to properly account for the summary judgment standard and fails to properly account for the evidentiary inferences available on this record that would allow a reasonable factfinder to reject defendants' contention that their arrangement with plaintiffs falls within an exception to the RLTA.

In the dissent's view, there is no meaningful distinction between the inferences available regarding occupancies at an apartment complex and occupancies at hotels or motels, and the dissent points out that our decision in *Montgomery* "made no mention of any requirement that the

rooms needed to have been limited to employees. *See id.* at 317-23. Presumably, under other circumstances, hotel guests could have occupied the rooms, just as other tenants might rent Unit 112 at other times." 306 Or App at 690 (DeVore, J., concurring in part, dissenting in part). Our point is not that the apartment rooms needed to be limited to employees, but rather that apartment units are, by nature, typically occupied *by tenants*. Even if hotel guests could have occupied the rooms in *Montgomery*, the ordinary arrangement between hotels and guests is explicitly *not* a landlord-tenant relationship. *See* ORS 90.100(48) (defining "transient lodging"); ORS 90.100(49) (defining "transient occupancy"); ORS 90.110(4) (excepting from the RLTA "[t]ransient occupancy in a hotel or motel").

Additionally, the rent credit does not have the conclusive weight that the dissent seems to place on it so as to take defendants' entitlement to the benefit of the exception away from a jury. A rent credit is evidence of a link between employment and occupancy, but the existence of a rent credit does not, by itself, transform every occupancy into one that is conditional upon employment as a matter of law. A tenant does not automatically lose the protections of the RLTA by accepting, for example, a small rent credit for mowing the lawn of an apartment complex or for receiving rent checks on behalf of the landlord; there is no support for such an expansive view of the statutory exception or treating the fact of a rent credit as dispositive.

As the party that carries the burden of proof and persuasion at trial on the application of the exception, defendants were required to do more at the summary judgment stage than present evidence from which a factfinder could find that employment was conditional; they were required to present evidence *from which no reasonable factfinder could determine otherwise. Wieck*, 274 Or App at 470. Given the limited evidence presented by defendants concerning the arrangement, and given the nature of the apartment complex and its units, ambiguity in the employment agreement, and the deposition testimony that the Rowdens were both tenants and employees, defendants fell short of that standard. We therefore agree with plaintiffs that defendants'

arguments under ORS 90.110(7) do not provide an alternative basis on which to affirm the court's grant of summary judgment on the RLTA claim.[7]

> ### 2. *ELA*

Defendants' second argument relates to Darin and Natalie's claim under the ELA; defendants argue that, as a matter of law, working and breathing in an office is not "inherently dangerous" for purposes of liability under the ELA. *See Miller v. Georgia Pacific Corp.*, 294 Or 750, 753, 662 P2d 718 (1983) (the ELA "requires a higher degree of care for employers and others having charge of work involving risk or danger to employees"). We reject that argument without extended discussion. The ELA claim is not based on working and breathing in an office; Darin and Natalie alleged that they were required to perform maintenance and other work in a building that was growing various forms of dangerous molds and toxins, that they repeatedly informed defendants about problem areas and their concerns, and that defendants refused and failed to take any action to investigate or remedy the causes of the proliferation of mold despite the warnings. The record does not present the type of "clear case" for the court to assess the risk as a matter of law. *See Snyder v. Prairie Logging Co., Inc.*, 207 Or 572, 577, 298 P2d 180 (1956) ("Ordinarily, the question of whether a particular employment is inherently dangerous is for the jury to decide from the evidence in the case, and it is only in clear cases that the court is authorized to decide, as a matter of law, that the work does not involve risk and danger within the meaning of [ORS 654.305].").

## C. *Claims Against the McNutt Family*

Last, we address plaintiffs' fourth assignment of error, in which they contend that the trial court erred in dismissing their claim under the UFTA and their veil-piercing

---

[7] The RLTA claim was brought only by Darin and Natalie, and plaintiffs later moved to amend the complaint to add the Rowden children. They request that, upon reversal of the summary judgment ruling, we "remand with instructions to allow the children to be added to the [RLTA] claim." We decline that request and leave any decision in that regard to the discretion of the trial court in the first instance.

theory as premature. The trial court raised ripeness concerns *sua sponte*, then concluded that the theories of recovery against the McNutt family were not justiciable until plaintiffs obtained an uncollectible judgment against Hogan Woods, LLC. We agree with plaintiffs that the court erred in concluding that those theories regarding the McNutt family were brought prematurely.

Ripeness depends on "whether the controversy involves present facts as opposed to hypothetical future events." *Menasha Forest Products Corp. v. Curry County Title*, 234 Or App 115, 120, 227 P3d 770 (2010), *rev'd in part on other grounds*, 350 Or 81, 249 P3d 1265 (2011). As a practical matter, "'[p]resent facts' and 'hypothetical future events,' *** do not announce themselves as such," and "[r]ipeness is often a matter of degree." *Id.* at 120-21.

In this case, the court determined that the claims against the McNutt defendants were contingent on a hypothetical future event—specifically, plaintiffs first obtaining an uncollectible judgment against Hogan Woods, LLC. Although the trial court employed the same rationale with respect to both the UFTA claim and plaintiffs' veil-piercing theory, they present slightly different questions regarding ripeness, and we therefore discuss them separately.

1. *Veil-piercing theory*

ORS 63.165(1) provides that "[t]he debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, are solely the debts, obligations and liabilities of the limited liability company," and that "[a] member or manager is not personally liable for a debt, obligation or liability of the limited liability company solely by reason of being or acting as a member or manager." Piercing the corporate veil is a court-made doctrine whereby the corporate form is disregarded to avoid injustice, and it can apply in the case of limited liability companies as well as corporations. *See Amfac Foods v. Int'l Systems*, 294 Or 94, 104, 654 P2d 1092 (1982); *Sterling Savings Bank v. Emerald Development Co.*, 266 Or App 312, 341, 338 P3d 719 (2014) ("In Oregon, the doctrine of corporate veil piercing applies to LLCs in the same way that it does to corporations.").

*Amfac* is the seminal Oregon decision on veil piercing. As articulated in that decision, a plaintiff seeking to pierce the corporate veil must prove that a defendant had control of the limited liability company, that the defendant used that control to engage in improper conduct, and that, as a result of the improper conduct, the plaintiff was harmed. 294 Or at 108-09; *State ex rel Neidig v. Superior National Ins. Co.*, 343 Or 434, 454-55, 173 P3d 123 (2007) (summarizing the *Amfac* elements). As for the third element—harm resulting from the improper conduct—*Amfac* explains:

> "[T]he plaintiff must also demonstrate a relationship between the misconduct and the plaintiff's injury. If a shareholder's improper conduct causes no injury to a corporate creditor, there is no basis for a recovery from the shareholder. Consistent with the general policy of shareholder immunity, a shareholder's improper conduct does not give a hunting license to a corporate creditor to redress a general wrong."

294 Or at 111 (footnote omitted).

In this case, plaintiffs alleged that, through a series of actions, the McNutt family purposefully undercapitalized Hogan Woods, LLC, "alienating and disposing of the funds necessary to satisfy a judgment under this lawsuit." Although that theory is contingent by nature—that is, it requires a judgment that cannot be satisfied by the company—we disagree that it involves the type of contingency that renders it premature. As we explained in *Riverview Condo. Assn. v. Cypress Ventures (A149542)*, 266 Or App 612, 616, 338 P3d 755 (2014), "The fact that a controversy might involve some unsettled questions or contingencies does not, by itself, render the case 'unripe' or mean that the controversy as a whole is 'contingent' and therefore not justiciable." In that case, we rejected an argument by third-party defendants that contribution and indemnity claims were not ripe until the third-party plaintiff's underlying liability had been determined and the judgment had been paid. *Id.* at 615. We reasoned that the parties had a present dispute about completed events, despite the contingency concerning the discharge of the underlying liability:

> "The parties have a present dispute about their respective roles and responsibilities relating to the construction of the

Riverview Condominium, and the only true contingency—discharge of the underlying liability—will flow directly from the resolution of issues within the case itself. We are not persuaded that such a minimal degree of 'contingency'—given that the law presumes that Brookfield will satisfy any obligation to the condominium association and provides enforcement mechanisms if it does not—is sufficient to render this controversy nonjusticiable, given the parties' present and competing interests in determining their respective fault based on completed events."

*Id.* at 616-17 (footnote omitted).

The same can be said here. The parties have a present dispute about past events, including past conduct allegedly leaving the company unable to satisfy a judgment against it. If plaintiffs prove their case, then the only true contingency—that the judgment remains unsatisfied—will flow directly from resolution of the issues in the case. That is not the type of contingency that will render this controversy nonjusticiable, given the parties' present and competing interests in determining their respective liabilities for already completed events.[8] Defendants have not supplied, and we are not aware of, any contrary, persuasive authority on that point. *Accord Wachovia Sec., LLC v. Neuhauser*, No 04 C 3082, 2004 WL 2526390 at *10 (ND Ill, Nov 5, 2004) ("A plaintiff may prove that a corporation will not be able

---

[8] The trial court analogized the case to one requesting a declaration of rights to recover against a defendant's insurance company:

"The claims are the equivalent of a claim by the plaintiff in a tort action for a judicial declaration that a judgment against the defendant, if obtained, would be covered by the defendant's insurer. The Supreme Court has said that such a claim is not ripe for adjudication—and, hence, not justiciable—because the plaintiff 'may never win a judgment in the tort action.'"

(Quoting *Hale v. Fireman's Fund Ins. Co. et al*, 209 Or 99, 113, 302 P2d 1010 (1956)).

We are not persuaded that the comparison is apt. In that circumstance, "[t]he defendant insurance companies are not required to do anything concerning the plaintiff until a judgment is entered in his favor against the [insured tortfeasor] and remains unsatisfied for thirty days," which the court determined did not reveal "a controversy 'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" 209 Or at 113. Here, by contrast, defendants' alleged conduct giving rise to the injury has already occurred, and all that remains is for plaintiffs to prove what they alleged: that, as a result of the McNutt family's past conduct, they have been harmed in their ability to recover from Hogan Woods, LLC. Considering that ripeness involves matters of degree, we conclude that the immediacy of the dispute is more like *Riverview Condo. Assn.* than *Hale*.

to make good on a debt without first successfully bringing a separate lawsuit against the corporation and waiting for that judgment to go unpaid. No case has been found which supports the [individual defendants'] contention that a piercing claim is not ripe until a separate lawsuit is first brought and fully adjudicated as against the corporation that is being pierced."). Accordingly, we reverse the trial court's ruling with regard to plaintiffs' veil-piercing theory.

2.  *UFTA claim*

Plaintiffs' UFTA claim presents a slightly different question because it is a statutory rather than court-created basis for recovery. ORS 95.260 provides:

"(1)   In any action for relief against a transfer or obligation under ORS 95.200 to 95.310 [comprising the UFTA], a creditor, subject to the limitations provided in ORS 95.270, may obtain:

"(a)   Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.

"(b)   An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by any applicable provision of any other statute or the Oregon Rules of Civil Procedure.

"(c)   Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

"(A)   An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

"(B)   Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

"(C)   Any other relief the circumstances may require.

"(2)   If a creditor has obtained a judgment on a claim against the debtor and if the court so orders, the creditor may levy execution on the asset transferred or its proceeds."

The terms "creditor" and "claim" are defined in ORS 95.200. "'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,

undisputed, legal, equitable, secured or unsecured." ORS 95.200(3). "'Creditor' means a person who has a claim against a debtor," ORS 95.200(4), and "debtor," in turn, "means a person against whom a creditor has a claim," ORS 95.200(6).

Defendants argue that plaintiffs do not have a "right to payment" under the UFTA because, "[a]s things stand right now, plaintiffs are not entitled to any payments from defendants." That argument ignores the broad text of the UFTA, which encompasses a right to payment "whether or not the right is reduced to judgment," "unliquidated," "contingent," and even "disputed." ORS 95.200(3). The alleged right to payment in this case—the right to recover in a pending tort action—falls squarely within the plain text of the statute. Defendants have not provided any textual, contextual, or legislative history to suggest that, despite the broad definition of "claim," the legislature nevertheless intended to require a tort claimant to have a judgment in hand before pursuing a fraudulent transfer claim.

We further observe that, when enacting the UFTA, the legislature provided that "ORS 95.200 to 95.310 shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of ORS 95.200 to 95.310 among states enacting it." ORS 95.300. Other courts have universally rejected the narrow view of "right to payment" and ripeness advocated by defendants. *See, e.g.*, *Friedman v. Heart Inst. of Port St. Lucie, Inc.*, 863 So 2d 189, 192 (Fla 2003) (explaining that, under the UFTA, "'claim' is broadly constructed" and "as is universally accepted, as well as settled in Florida, 'A "claim" under the Act may be maintained even though "contingent" and not yet reduced to judgment'"); *Curtis v. James*, 459 SW3d 471, 475 (Mo Ct App 2015) (explaining that, "under the plain language of the statute, a creditor is not required to obtain a judgment in order to pursue an action under the Act and the circuit court misapplied the law in requiring otherwise"); *accord Foisie v. Worcester Polytechnic Inst.*, 967 F3d 27, 36 (1st Cir 2020) ("[T]he controversy between the parties is of sufficient immediacy and reality to warrant the issuance of the judicial relief sought. The plaintiff's underlying civil claims

are actively being litigated and, if she successfully prosecutes her fraudulent conveyance claims, various remedies could be crafted to redress her injury regardless of whether her civil claims have been reduced to judgment by that time." (Internal quotation marks and citations omitted.)); *DFS Secured Healthcare Receivables Tr. v. Caregivers Great Lakes, Inc.*, 384 F3d 338, 352 (7th Cir 2004), *certified question accepted sub nom DFS Secured Health Care Receivables Tr. v. Caregivers Great Lakes, Inc.*, No 94S00-0410-CQ-447, 2004 WL 2307967 (Ind, Oct 14, 2004) (explaining that "the fact that the appellants may dispute the claim would not change DFS's status as a 'creditor'" under the plain text of the UFTA); *Nikko Materials USA, Inc. v. Navcom Def. Elecs., Inc.*, No CV054158JFWVBKX, 2014 WL 12700714 at *4 (CD Cal, Jan 22, 2014) (rejecting a ripeness argument under the UFTA and explaining that "there is no requirement under the UFTA or case law that requires Gould to wait to pursue its UFTA claim until its 'right to payment' is reduced to judgment, liquidated, fixed, or mature, or until NDE fails to make a payment"); *Wells Fargo Bank, Nat. Assn. v. Iny*, No 2:13-CV-01561-MMD, 2014 WL 5364120 at *4 (D Nev, Oct 21, 2014) ("By virtue of the clear language of the UFTA provision in Nevada, the existence of a 'disputed' claim does not bar this Court's ability to consider Plaintiff's fraudulent transfer claims to allow Plaintiff to protect its ability to recover once the disputed claim is resolved in its favor.").

Based on the plain text of the statute, we conclude that the UFTA recognizes a party's right to seek relief when a fraudulent transfer is made in the midst of dispute over the right to payment, and the trial court therefore erred in concluding that an unsatisfied judgment against Hogan Woods, LLC, was a necessary precursor to plaintiffs' UFTA claim. Because the UFTA claim, together with the underlying dispute between the parties, involves present facts and a live controversy, we reverse the grant of summary judgment on that claim.[9]

Reversed and remanded.

---

[9] We express no opinion on the merits of the UFTA claim or veil-piercing theory; the only issue before us is the trial court's conclusion that they were premature.

**DeVORE, J.,** concurring in part, dissenting in part.

Defendants contend that ORS 90.110(7) of the Residential Landlord Tenant Act (RLTA) excepted plaintiffs as resident employees from coverage of the act, citing our decision in *Montgomery v. Howard Johnson Inn, Gresham*, 228 Or App 315, 322-23, 208 P3d 503 (2009). The majority opinion responds that "defendants misconstrue the nature of the exception and our holding in *Montgomery*." 306 Or App at 673. Defendants stress that plaintiffs were resident managers at all times during their occupancy and that, as a consequence of their employment and occupancy, plaintiffs received rent credits and free electrical service under the conditions of their employment compensation agreement. No one disputes those facts. Yet, the majority opinion concludes that this record does not permit the court to determine that the resident employee exception applies to these resident managers. I disagree.

## POINTS OF DISAGREEMENT

The majority opinion makes several statements on its way to reaching its conclusion. Those statements posit unresolved factual questions and presume the legal meaning of ORS 90.110(7). I believe that those statements warrant examination.

First, the majority opinion observes, "Nothing in the record clearly establishes that the 'right to occupancy' of Unit 112 at Hogan Woods is limited to employees by virtue of their work at Hogan Woods." 306 Or App at 674. That fact, according to the majority opinion, distinguishes this case from *Montgomery* where the statutory exception applied.

Next, the majority opinion makes statements that presuppose a keenly narrow view of the statutory exception. The majority opinion posits that a factfinder might find that plaintiffs rented, or perhaps could be deemed to have rented, as ordinary tenants. 306 Or App at 674-75 ("The question is whether defendants' evidence compels a conclusion that *** plaintiffs' right to occupancy was conditional on their employment *rather than a landlord-tenant relationship*." (Emphasis added.)). The majority opinion declares

that defendants failed to show, as a matter of law, that plaintiffs, after leaving employment, could not have stayed on the property to rent just like ordinary tenants. *Id.* at 676 ("The evidence here does not similarly compel a conclusion that the Rowdens would have been required to vacate the premises—an apartment unit for tenants—had their employment ended before they voluntarily left."). The majority opinion requires defendants to have shown, as a matter of law, that plaintiffs would have been automatically evicted when employment ended. *Id.* at 675 n 6 ("Contextually, there is no indication that severance would have automatically resulted in a loss of the right to occupancy at Hogan Woods."). Because defendants failed to rule out that possibility, the majority opinion decides that defendants failed to show, as a matter of law, that plaintiffs' occupancy was conditioned on their employment.

The majority opinion adds that plaintiffs' employment agreement is "ambiguous as to whether it describes a conditional right to occupancy *as opposed to* a conditional rent credit." *Id.* (emphasis added). The majority concedes a rent credit is relevant but does not recognize the rent credit nor other conditioned terms of plaintiffs' employment agreement to show that plaintiffs' right to occupancy was conditioned on their employment within the meaning of ORS 90.110(7).

## RESIDENT EMPLOYEE EXCEPTION

The terms of the statute's exception are straightforward and its purpose is easily discovered. In material part, ORS 90.110(7) provides, "[T]he following arrangements are not governed by this chapter: * * * (7) Occupancy by an employee of a landlord whose right to occupancy is conditional upon employment in and about the premises." Together with other listed exceptions, ORS 90.110 defines the scope of Oregon's RLTA.

To find the purpose of the resident employee exception, we may look to the commentary found in a model statute. That is because Oregon's RLTA is drawn from the Uniform Residential Landlord and Tenant Act (URLTA). *See Bellikka v. Green*, 306 Or 630, 637-38, 762 P2d 997 (1988) (referring to the habitability provision of the URLTA, 7B Uniform Laws

Annotated, URLTA § 2.104); *Montgomery*, 228 Or App at 320 (referring to URLTA § 1.202). In *Montgomery*, we quoted the exception's purpose as expressed in that commentary:

> "'[The URLTA] regulates landlord-tenant relations in residential properties. It is not intended to apply *where residence is incidental to another primary purpose such as* residence in a prison, a hospital or nursing home, a dormitory owned and operated by a college or school, or residence by a landlord's employee such as a custodian, janitor, guard or *caretaker rendering services in or about the demised premises*.'"

228 Or App at 320 (quoting URLTA § 1.202 cmt (1972) (emphases added)). In other words, the exception's purpose is to define the scope of the RLTA by distinguishing between an ordinary tenant and the landlord's employee, who resides on the property.

In *Montgomery*, we referred to a dictionary for the meaning of the particular term, "conditional," when considering whether occupancy is "conditional" on occupancy within the meaning of ORS 90.110(7). 228 Or App at 320. We noted, "That adjective means among other things, '1: Containing, implying, subject to, or depending on a condition.'" *Id.* (quoting *Webster's Third New Int'l Dictionary* 473 (unabridged ed 2002)). To explain that, we should now add that, among other things, a "condition" is defined to mean "something that exists as an occasion of something else" or as "something that limits or modifies the existence or character of something else." *Webster's* at 473.

Before rushing to a conclusion about the meaning of "conditional," we should add that,

> "[i]n construing statutes, we do not simply consult dictionaries and interpret words in a vacuum. Dictionaries, after all, do not tell us what words mean, only what words *can* mean, depending on their context and the particular manner in which they are used."

*State v. Cloutier*, 351 Or 68, 96, 261 P3d 1234, 1249 (2011) (emphasis in original). Dictionaries do not "reveal what the legislature in fact meant in the absence of some evidence that the legislature consulted and relied on a particular definition of a particular dictionary at the time of enactment."

*State v. Holloway*, 138 Or App 260, 265, 908 P2d 324 (1995). Accordingly, we look for meaning in the wording, the context, and the purpose of provision at issue. *Cloutier*, 351 Or at 96; *Holloway*, 138 Or App at 265; *see also State v. Ziska / Garza*, 355 Or 799, 805, 334 P3d 964 (2014) (for the "sense the legislature had in mind * * * we look to the terms of the statute and how the words in dispute are used in context").

Fortunately, we can know the sense in which the legislature phrased the resident employee exception because we know that Oregon's RLTA "is a codification of the URLTA," *Montgomery*, 228 Or App at 320, and we have the commentary to the exception. It explains that the act "'is not intended to apply where residence *is incidental* to another primary purpose such as residence * * * [as a] caretaker rendering services in or about the demised premises.'" *Id.* (quoting URLTA § 1.202 cmt (emphasis added)). That is the intended sense in which ORS 90.110(7) provides an exception to the act's coverage when the "right to occupancy" of the premises by a landlord's employee is "conditional upon employment." The occupancy is "something that exists as an occasion of something else," which is the employment. *Webster's* at 473. Put another way, employment is "something that limits or modifies the existence or character of something else," which is the occupancy. *Id.* The statutory exception applies when occupancy "is incidental" to the primary purpose as a "'caretaker rendering services in or about the demised premises.'" *Montgomery,* 228 Or App at 320 (quoting URLTA § 1.202 cmt).

With that understanding, the facts that are undisputed should be enough to apply ORS 90.110(7) as a matter of law. We know that plaintiffs occupied the premises at all times while serving as property managers. Each plaintiff had an employment compensation agreement. The agreements engaged each plaintiff as a "property manager" for a stated salary plus "rent credit" in a stated figure and further provided that the utility expense of electricity would be paid by the employer. The agreements described the "duties of personnel," which included collecting rents and caring for the property. Shunning a landlord-tenant relationship, the agreements here declared, "Nothing herein shall be deemed

to create any relationship between the parties other that [*sic*] an employment relationship, terminal at will by either party." In making the agreements, plaintiffs subscribed to the following statement:

> "I understand and agree to the above compensation package for the position I have been hired for. I also understand that *my apartment rent credit is a condition of employment* and that *in the event that my employment ends [sic] may be required to vacate immediately.*"

(Emphases added.) We refer to this quoted provision as the "condition term" of the employment agreement.

Recalling the terms of the statutory exception, we should recognize that the "condition term" of plaintiffs' employment agreement described their right to occupancy as "something that exists as an occasion of something else," *i.e.*, their employment. *Webster's* at 473. Considering the employment agreement as a whole, their occupancy was "incidental" to their primary purpose as a "'caretaker rendering services in or about the demised premises.'" *Montgomery,* 228 Or App at 320 (quoting URLTA § 1.202 cmt). Without doubt, plaintiffs' occupancy was tied to their employment. Thus, their occupancy was "conditional" on their employment within the meaning of ORS 90.110(7).

## COUNTERPOINTS

The majority opinion avoids that conclusion based on the statements noted at the outset. I worry that the statements may assume a misconception about ORS 90.110(7) and the scope of the RLTA. I address them each in turn.

No doubt a genuine issue of material fact *could* preclude summary judgment. ORCP 47 C. But it is immaterial to say, as the majority opinion does, that "[n]othing in the record clearly establishes that the "right to occupancy" of Unit 112 at Hogan Woods is limited to employees by virtue of their work at Hogan Woods." 306 Or App at 674. Given the purpose of the statutory exception, we should have agreed that the exception serves to make a distinction between ordinary tenants, who are covered by the RLTA, and resident employees, who are excepted from the act. The statute's focus is on the person in question. The focus is *not* on

any particular rental unit. In *Montgomery*, the resident employee took two rooms in the Howard Johnson Inn—one in which to live and one for storage. 228 Or App at 317. We held that the resident employee exception applied, although our decision there made no mention of any requirement that the rooms needed to have been limited to employees. *See id.* at 317-23. Presumably, under other circumstances, hotel guests could have occupied the rooms, just as other tenants might rent Unit 112 at other times.[1]

Of greater concern are statements of the majority opinion that defendants failed to show, as a matter of law, that plaintiffs' right to occupancy was "conditional" on their employment, because they failed to show that they could *not* have stayed to rent like ordinary tenants. The majority opinion assumes that defendants were required to show that plaintiffs' occupancy would have automatically and necessarily ended with their employment. 306 Or App at 674-75, 676.

Surely it is not a genuine issue of material fact to ask whether plaintiffs might have been able to arrange to stay and rent the unit as ordinary tenants after their employment terminated.[2] That does not tell us whether their occupancy at the relevant time was conditional on employment. To pose a hypothetical question about a different set of facts is immaterial. The statute asks about the arrangement at the time plaintiffs actually occupied the premises. The statute asks whether the present occupancy is "by an employee of a landlord whose right to occupancy is conditional upon employment in and about the premises." ORS 90.110(7).

---

[1] If the majority opinion intends to distinguish between an apartment and a motel, I would agree that a guest in a motel does not fall within the ambit of the RLTA, ORS 90.110(4), and that plaintiffs might have arranged to have been ordinary tenants of an apartment. Yet, regardless whether the property is a motel or apartment, it is plaintiffs' role as "property managers" that matters to the resident employee exception of ORS 90.110(7). It is a question of the relationship between employment and occupancy, not a question about the nature of the property. Consequently, *Montgomery* is not so easily distinguished.

[2] As to that possibility, we observed in *Montgomery*, 228 Or App at 322:

"Nothing in ORS 90.110(7) itself suggests that an employer may not collect rent from an employee who resides on the employer's premises, and plaintiff has not identified any other provision of the RLTA or any principle of Oregon law that would prevent an employer from doing so."

The employment agreement answers that question. As we will see, the quoted provision makes the right to occupancy "conditional" on employment, regardless whether the termination of occupancy is automatic or elective. In relevant part, plaintiffs subscribed to the term, providing "my apartment rent credit is a condition of employment and that in the event that my employment ends [*sic*] may be required to vacate immediately." In the absence of argument that the term is ambiguous or evidence to respond to ambiguity, our task to construe the condition term is a matter of law. *See Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997) (determining whether a contract is ambiguous is a question of law, and, when it is not ambiguous, construction of a contract is a matter of law).

We should determine that the agreement provides a condition that automatically terminates the "right" to continued occupancy upon termination of employment. The majority opinion acknowledges that the statement, "my apartment rent credit is a condition of employment," makes a rent credit conditioned on employment. The clause about a rent credit and the clause about vacating are part of the same sentence. As such, they should be construed the same way.

Even viewed in isolation, the clause about vacating indicates that plaintiffs' "right to occupancy" is automatically affected by termination of employment. That is so because plaintiffs have agreed that they may be required to vacate immediately. The phrase "*may* be required to vacate" does not introduce uncertainty about the legal effect of that term of the agreement. (Emphasis added.) They no longer have a "right" to remain because they may be directed to "vacate immediately." Staying longer would only make them the equivalent of a holdover tenant after expiration of a lease. Their "*right* to occupancy" under the employment agreement would have ended.

Even if plaintiffs' occupancy did not terminate automatically upon termination of employment, the "condition term" indicates that the employer has reserved the right to require plaintiffs to "vacate immediately" when employment ends. At the least, that statement means that the employer

can decide that the end of employment means the end of occupancy. That statement means that the plaintiffs' "right to occupancy" is gone and their ability to continue occupancy is subject to a discretionary decision of the employer. As a result, plaintiffs' occupancy is no less conditioned than if the occupancy ended automatically. The factual matter whether the employer exercises the election does not change the legal significance that such a condition exists. At the least, it is a condition that is subject to being exercised, and, even if the condition waits to be exercised, plaintiffs' right to occupancy is undeniably "conditional" on employment all the same. In short, there *is* a condition tied to employment, no matter how the quoted provision is construed.

The law of future estates provides an analogy to show that occupancy is "conditional" on employment, regardless which view of the "condition term" is taken— whether automatic or elective. The majority view, requiring an express and automatic termination of tenancy, is like a devise of an estate in "fee simple determinable" where a defeasible fee ends automatically on the happening of the stated event. *See Restatement (First) of Property* § 44 (1936) (In relevant part, a fee simple determinable "provides that the estate shall automatically expire upon the occurrence of a stated event."). If, as the majority reads it, the employment agreement only provides that the employer may require plaintiffs to vacate when employment ends, then that is like a "fee simple subject to a condition subsequent." *Restatement* § 45 (In relevant part, a fee simple subject to a condition subsequent "provides that upon the occurrence of a stated event the conveyor or his successor in interest shall have the power to terminate the estate so created."). A fee simple subject to a condition subsequent requires a grantor to act to exercise the condition; the grantor must "re-enter" to end the present interest. *Magness v. Kerr et al.*, 121 Or 373, 379, 254 P 1012 (1927); *see also Wagner v. Wallowa County*, 76 Or 453, 464, 148 P 1140 (1915) (a condition subsequent requires "some affirmative act of the grantor or those who represent him"). That is like the employer's act to elect to evict.

Even assuming that the employer must act to exercise the "condition term," it is still a condition that limits

plaintiffs' "right to occupancy." It does not matter whether plaintiffs might have happened to have stayed on to rent as ordinary tenants after their employment terminated. Given the legal effect of their employment agreement, defendants did not need to show that plaintiffs' physical occupancy would have terminated or that their employer would not have acquiesced to allow them to stay to rent after employment ended. No matter how construed, their employment agreement showed that their right to occupancy was "conditional" on employment.

Finally, the majority opinion indicates that the "condition term" of the employee agreement "is ambiguous as to whether it describes a conditional right to occupancy *as opposed to* a conditional rent credit." 306 Or App at 675 (emphasis added). That statement suggests more of a distinction than a relationship between occupancy and a rent credit. To clarify, the majority opinion adds, "A rent credit is evidence of a link between employment and occupancy, but the existence of a rent credit does not, by itself, transform every occupancy into one that is conditional upon employment as a matter of law." *Id.* at 677. I welcome the recognition of the relevance of a rent credit as a condition of occupancy, and I would agree that, standing alone, a rent credit might not itself be dispositive,[3] but I disagree with the majority opinion's isolation of the rent credit, rather than recognition of it as part of the circumstances by which employment conditioned plaintiffs' occupancy.

Rent credits cannot be irrelevant to the question whether occupancy is tied to the employment of resident employees under ORS 90.110(7). Rent credits are likely the financial means and the administrative device by which resident employees become engaged as resident employees. For example, in *Montgomery*, the plaintiff was charged for her rooms but received "an employee discount," which was calculated as earned by three eight-hour workdays for each two-week pay period. 228 Or App at 317. And, when

---

[3] I certainly agree that not every situation in which a tenant trades labor for a rent discount makes a tenant a resident employee within the meaning of ORS 90.110(7). Such an incidental arrangement would stand alone free of any condition whereby the landlord reserves the right to require the tenant to vacate immediately upon termination of the tenant's services.

employment ended, the employer charged her the full costs of her rooms. *Id.* at 318. Her employee discount was part of the complex of facts, including the plaintiff's termination and ejection, by which we determined that the employee exception applied.[4] *Id.* at 317-21. The plaintiff argued that, because she paid some rent, the statutory exception should not apply. *Id.* at 321-22. We rejected the argument that paying partial rent (subject to a discount) avoided the resident employee exception. We held that the trial court did not err when dismissing plaintiff's claim under ORCP 54 B(2) for failure to present a *prima facie* case. *Id.* at 317, 322-23. The case was resolved, not as a dispute of fact, but as a matter of law under ORS 90.110(7).

In our case at hand, the majority opinion concedes that the rent credit is relevant. After all, evidence of a rent credit is evidence that has a tendency to show how employment relates to occupancy. *See* OEC 401 (evidence having any tendency to make the existence of a fact more or less probable is relevant); OEC 402 (relevant evidence is admissible). It helps to show "something that limits or modifies the existence or character of something else." *Webster's* at 473. However, evidence of the rent credit does not stand alone; it is part and parcel of an employment agreement that conditions the right to occupancy on employment.

Even if considered alone, the rent credit and free electrical service are significant because they were explicitly conditioned upon employment. As such, they were financial devices used to further plaintiff's occupancy and employment as property managers. Therefore, the statement—"my rent credit is a condition of employment"—is undeniable evidence that plaintiffs' occupancy was "conditional" on their employment.

Critically, the rent credit was one part of the employment agreement that did not stand alone. It was part of a statement that provided: "I also understand that *** *in the event that my employment ends [sic] may be required*

_____

[4] The fact that, in our case, plaintiffs moved out before employment ended, whereas the plaintiff in *Montgomery* was locked out when employment ended, is a factual distinction in the tales of the two cases, but it should make not a legal difference due to the terms of plaintiffs' employment agreement.

*to vacate immediately.*" As discussed, the second part of the statement also imposed a condition. That second part of the statement was in effect the moment plaintiffs signed the agreement; the effect of the statement was triggered by termination of employment; it ended any prior "right" to continued occupancy; and it permitted the employer to elect to force plaintiffs to vacate "immediately." Taken together, the rent credit and the employer's option to oust served, from the outset, to condition occupancy on employment, as a matter of law. Thus, the employment agreement is a condition on the "right to occupancy" no matter how construed.

In my opinion, the conclusion that the employee exception governs here is inescapable. Construction of the employment agreement is a matter of law, not a genuine dispute of material fact. *See Yogman*, 325 Or at 361 (absent offering of evidence on ambiguous terms, a contract is construed as a matter of law). As a result, ORS 90.110(7) provides an alternate basis for the trial court's dismissal of plaintiffs' RLTA claims—one that defendants urged in the trial court but the court did not reach. *See Brewer v. Dept. of Fish and Wildlife*, 167 Or App 173, 180-81, 2 P3d 418 (2000) (an appellate court may affirm a ruling of the trial court on grounds different from those on which the court relied, provided there is evidence in the record to support the alternative ground); *see also State v. Lovaina-Burmudez*, 257 Or App 1, 14, 303 P3d 988 (2013) (no remand for issue presented below if the remand would be gratuitous).

## CONCURRENCE

The majority opinion makes substantial developments in Oregon law. Among them, I concur in the rejection of issue preclusion because the causation standard of workers' compensation is distinguishable. I concur in the major development allowing plaintiffs' claim to pierce the corporate veil at the same time as the underlying, principal claims. And, I concur in the easier determination that plaintiffs may do the same with their fraudulent transfer claim. The majority opinion will guide many cases to follow.

## CONCLUSION

Because I fear that the majority opinion misconstrues the resident employee exception of the RLTA, I dissent. I concur in all other aspects of the opinion of this court.